**PHELPS v. UNITED STATES.**
**PETERS v. SAME.**

**LECHNYR v. SAME.**

**HICKS v. SAME.**

**Nos. 13110–13113.**

Circuit Court of Appeals, Eighth Circuit.
April 3, 1947.

Rehearing Denied June 13, 1947.

See 161 F.2d 940.

RIDDICK, Circuit Judge, dissenting **in** part.

O. A. Blanchard, of St. Paul, Minn. (Jerome Hoffmann, John A. Burns and Walter T. Ryan, all of St. Paul, Minn., and Ray G. Moonan, of Waseca, Minn., on the brief), for appellants.

William P. Murphy and James J. Giblin, Asst. U. S. Attys., both of St. Paul, Minn., (Victor E. Anderson, U. S. Atty., of St. Paul, Minn., on the brief), for appellee.

Before THOMAS, JOHNSEN and RIDDICK, Circuit Judges.

JOHNSEN, Circuit Judge.

Appellants were convicted by a jury, under 18 U.S.C.A. § 88,[1] of having conspired to defraud the United States of the proper administration of its regulations relating to the rationing of rubber tires.[2] The regulations had been promulgated by the Office of Price Administration under the Emergency Price Control Act of 1942 and the Second War Powers Act, 1942, both as amended.[3]

The indictment ran against ten defendants. The Government dismissed as to one.[4] Two others pleaded guilty. The remaining seven stood trial. Three were acquitted and four were convicted. Two of the convicted and two of the acquitted were or had been officials in the district office of the OPA at St. Paul, Minnesota. All of the convicted have appealed.

The conspiracy was alleged to have covered a period from about April 1, 1943, to about February 1, 1945. Sixteen overt acts were set out in the indictment. The gravamen of the charges was that the defendants, with intent to thwart the purposes and provisions of the rationing regulations, had conspired, among themselves and with other persons unknown, to obtain a monopoly on the used-tire stocks accumulated at tire inspection stations throughout Minnesota; to effect the release and delivery of such tires to defendant Peters (convicted) and defendant Reed (plead guilty); to have such tires released to Peters and Reed without proper inspection by OPA tire examiners; to secure the inclusion in such tires of re-usable tires and tires which could be repaired or recapped; to permit Peters or Reed to purchase such tires at such prices as they might arbitrarily fix; to have Peters or Reed sell the tires before or after recapping them; and to allow all of the defendants in some manner and measure to profit from these operations.

---

[1] 18 U.S.C.A. § 88 (Criminal Code, section 37): "If two or more persons conspire either to commit any offense against the United States, or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be fined not more than $10,000, or imprisoned not more than two years, or both."

Under this statute, the term "defraud the United States" includes depriving the Government by dishonest means of the proper administration of any law or function. Braatelien v. United States, 8 Cir., 147 F.2d 888; Langer v. United States, 8 Cir., 76 F.2d 817, 824. See also Hammerschmidt v. United States, 265 U.S. 182, 188, 44 S.Ct. 511, 68 L. Ed. 968; and compare United States v. Manton, 2 Cir., 107 F.2d 834.

[2] Ration Order No. 1A, 7 Fed. Register 9160, as amended. The sections of the order or regulation which the Government here says are pertinent are § 1315.201(a) (34), § 1315.301(b), § 1315.307—Amendment 63, § 1315.307—Amendment 79, § 1315.308—Amendment 63, § 1315.308—Amendment 79, § 1315.603—Amendment 63, § 1315.610(b)—Amendment 63, § 1315.610(b)—Amendment 79, § 1315.701—Amendment 79, § 1315.702—Amendment 79, § 1315.704(a)—Amendment 79, § 1315.801—Amendment 28, § 1315.804(c)—Amendment 38, § 1315.804(k)—Amendment 49, § 1315.806(g) (2)—Amendment 32. These various sections appear in 7 F.R. 9160, 8 F.R. 6735, 7660, 9767, 12013, 16894, 9 F.R. 8059.

[3] 50 U.S.C.A.Appendix, § 901 et seq., and Id., § 633, respectively.

[4] A juvenile, 17 years old at the time of the offense, who was one of the Government's principal witnesses on the trial.

As is generally familiar, after we were catapulted into World War II, the civilian rubber situation in this country soon became acute. All excess automobile tires, other than those in the hands of manufacturers and dealers, were required to be turned in, and the sale of usable tires, whether new or old, was placed under rationing control. The OPA regulations permitted a user to obtain a tire for replacement purposes, only upon application to and action by a rationing board, after an inspection of the old tire by some authorized tire inspector and a certification of its condition indicative of the need for replacement. Under the definitions in the regulations, it was intended that there should be neither a certification of need nor a granting of replacement, if the tire was "capable of being used, or capable of being repaired for use" by the owner. § 1315.201(a) (34). It also was provided that "No inspector may certify any fact concerning the condition of tires or tubes without making a personal and adequate inspection to determine such fact." § 1315.-603—Amendment 63.

The regulations contained a further provision that "No person participating in the administration of Ration Order No. 1A shall act officially in any matter arising thereunder as to which he has any interest, by reason of business connection or relationship by blood, marriage or adoption." § 1315.301(b). Notwithstanding this provision, appointments were made generally of tire dealers as inspectors, because ordinarily they were the only ones having the experience, equipment and location necessary to the practical handling in a community of the required inspections. There existed, of course, in this situation the possibility that a dealer might unconsciously or otherwise allow his interest in selling a tire to influence his inspection and certification. Tire inspectors, however,

were "subject to the supervision of tire examiners employed by the Office of Price Administration" (§ 1315.307—Amendment 63), and dealers were required to hold all replaced tires, subject to examination by an OPA tire examiner, for a period of thirty days, unless the earlier release of such tires was permitted by an authorized OPA representative. §§ 1315.307(a) (1), 1315.704(a) (2)—Amendment 79. In addition, a rationing board could require further inspection and certification by such inspector or inspectors as it might designate, before acting upon a replacement application.

The task of supervising and checking the work of the numerous inspection stations (approximately 2700 initially in Minnesota and more designated from time to time)[5] obviously was a sizable one. At least partially for the purpose of facilitating the work of its tire examiners (and in part also to promote the movement of the tires into scrap channels), the St. Paul OPA district office conceived the idea of having the American Legion of Minnesota get the tire dealers to donate the replaced tires to the Legion and having the members of the Legion collect and deposit the tires at central locations, where they would be available for OPA examination—the inducement to the Legion being that it was to receive the proceeds from the scrap when sold.[6] Attempts to put the plan into operation in a number of localities, however, soon demonstrated its lack of vitality, and it died a natural death. It is mentioned here because of the use which defendant Peters (convicted) and defendant Walker (plead guilty) undertook to make of it in the early stages of the alleged conspiracy, as will afterwards appear.

As another means of lightening and improving its tire rationing activities, the St. Paul office had attempted also to get a central truck tire inspection station established

[5] Many of these, however, were not tire dealers and apparently only made such inspections as every car owner was required to have made of his tires periodically, regardless of their condition, in order to qualify him for the right to future gasoline rationing coupons.

[6] Scrap tires could be sold only to licensed junk dealers and to holders of permits from the War Production Board to use such scrap. Junk dealers were required to sell the scrap on a carload basis to the Rubber Reserve Company, a government corporation, at a fixed price and were then permitted to buy it back in "wash" transactions, at a slightly higher figure, for resale to holders of War Production Board permits.

in the St. Paul-Minneapolis area, under the operation of some concern which was not engaged in the tire business.[7] The plan was to require that all truck tires be submitted to the central station for reinspection, after their condemnation by a regular inspection station, before applications for replacement would be considered by the rationing board, and that the tires, if replacement was approved by the central station, be left at the station for thirty days, where they would be available to OPA tire examiners, regardless of when or where the truck owners might be able to obtain their replacements. It was believed that, in addition to facilitating the task of OPA tire examiners, (and of more specific urgency at the time) the requiring of reinspection at a central station would substantially reduce the number of applications for truck-tire replacements being submitted to the rationing board and would secure generally a longer use of such tires by truck operators. The Fruehauf Trailer Co., on the solicitation of the St. Paul OPA office, agreed to establish a central truck tire inspection station on its Twin-Cities premises. After the station had been in operation for a time, the national office of OPA recognized the possibilities of such a plan, approved it for use throughout the country and adopted regulations to cover the establishment and operation of such stations. As with the Legion scrap-collection plan, the establishing of the St. Paul central station is of relevance here because of the part which its operations came to play (unbeknownst to Fruehauf) in the activities of the alleged conspirators.

Under the Government's theory, the conspiracy had its genesis about the time defendant Peters (convicted) sought to get into the business of manufacturing boots and reliners for tires, and thereafter continued to grow and spread until its disruption as a result of the disclosures made by defendant Norris (dismissed by the Government).

The pre-war supply of boots and reliners, which were capable of prolonging the life of many old tires, had been exhausted, and these accessories apparently were no longer being manufactured in the area. Peters, who had not previously been in the boot and reliner business, saw its possibilities, negotiated a deal for the equipment of a previous manufacturer, and was anxious to get under way. At about this same time, the two defendant OPA officials (acquitted) who primarily had been responsible for the formulation of the Legion-scrap-collection and the central-inspection-station plans professed also to have become concerned about the shortage of boots and reliners and to have given consideration to what could be done about it. One of them testified that he invited all former boot and reliner manufacturers in the Twin Cities, as well as Peters, to his office for a conference, and that Peters alone responded. The Government attempted to show by the other manufacturers that they had never received and had no knowledge of any such invitation.

In any event, Peters and the OPA official conferred. According to the evidence, Peters stated that all he needed in the situation was a supply of scrap tires from which to make boots and reliners. The OPA official within a short time gave him a letter, with the approval of the other acquitted official (a superior), appointing him a "deputy tire examiner" for OPA. This put Peters in a position to make official releases of all tires held by any inspection station in the district for OPA examination, and, of course, supplied him also with a prestiged entry to buy or otherwise acquire the tires for his business. Another such letter was shortly thereafter issued to one of Peters' employees, defendant Monson (acquitted), appointing him similarly as a deputy tire examiner.

The regulations made reference only to "tire examiners employed by the Office of Price Administration." No appointments of outsiders as deputy tire examiners were made by the St. Paul office except Peters and Monson. There was testimony by a junk dealer named Rockner that, when he discovered that Peters was depriving him of one of his established sources of scrap tires, he sought to get a letter, such as

---

[7] The operator of the central truck tire inspection station would derive his revenue from the fees which the OPA regulations authorized to be charged for making tire inspections.

Peters held, from the OPA official who had issued it, but his request was refused. The part that Peters' and Monson's letter played (and reasonably could have been found by the jury to be expected to play) is illustrated by the remark to Rockner of one of his previous customers, that he could not have a certain batch of tires "because the OPA man is going to take them." Rockner further testified that for a time during this period he was unable to buy any scrap tires whatever from his former regular sources. Defendant Phelps (convicted) and defendant Hicks (convicted), who had succeeded to the positions of the two acquitted OPA officials during the latter part of the alleged conspiracy (and to both of whom Peters had made loans at a low interest rate to enable them to purchase real estate, as referred to hereafter), permitted Peters' letter to remain in effect.

Prior to the time that the St. Paul office gave Peters his deputy-tire-examiner letter, he had induced defendant Walker (plead guilty), a tire-examiner from the Duluth office (which was independent of the St. Paul office) to allow him to accompany Walker in the latter's territory to acquire tires as Walker released them. This was while the American Legion scrap-collection plan was still being promoted and while dealers were being asked to donate their tires to the Legion. Walker testified that Peters initially paid him $100 in cash for tires which Peters thus picked up, with the suggestion that it was foolish for Walker to turn in the money to the Legion fund. Later, when Peters had obtained the deputy-tire-examiner letter from the St. Paul office, he proposed to Walker, and Walker agreed, that Walker could just as well alone pick up the tires which he released, through the use of his OPA position, and ship them to Peters, for which Peters would pay him $10 a ton. Walker operated in this manner for some time, and, according to his testimony, Peters made payments to him in cash, totalling around $300, for his activities. Thereafter Walker seems to have double-crossed Peters, by diverting tires to another outlet. When Walker's activities and relationships became known

to the Duluth office in January 1944, he was promptly discharged.

Peters and Monson made use also, of course, of their deputy-tire-examiner letters to release and obtain tires. The central truck tire inspection station operated by Fruehauf naturally became one of Peters' sources of supply. Defendant Lechnyr (convicted), whom Fruehauf had hired to handle the inspection and certification work at the central station, was a previous acquaintance of Peters. The central station took on the general inspecting of passenger-car tires, in addition to its reinspecting of truck tires. While the testimony does not show that the accumulations of used tires released and taken over by Walker, Peters and Monson from the outstate general inspection stations had contained usable tires (though a jury could hardly be required to believe that any of the three in their money-motived quest of tires was much concerned about making examinations within the regulations and being certain to release only scrap tires), there was, as to the central station, direct evidence by the Government that condemnation, release and disposal had been made of large numbers of usable tires.

Peters began his dealings with Lechnyr at the central station by making payment for used tires to Lechnyr for the benefit of the Legion fund. According to the statement which Lechnyr gave the Government investigator at the time the situation broke, Peters soon suggested (as he had done with Walker) that Lechnyr might as well personally be getting the money for the tires as to turn it over to the Legion fund—though on the witness stand Lechnyr testified that it was he and not Peters who had first proposed in their conversation that he ought to be permitted to retain the money. At any rate from that time on, Lechnyr pocketed the money from the tires that he sold. Of more serious import, he also disregarded his obligation as a tire inspector and did not concern himself with whether the tires brought to the station for inspection or reinspection were entitled to replacement but attempted to grab as many usable tires as possible. He went so far even, when tires were submitted for rein-

spection by concerns which intended to pick them up at the end of the thirty-day holding period, as to remove all the usable tires and substitute scrap tires for them. He further gave instructions to defendant Norris (dismissed by the Government), whom Fruehauf had hired on Lechnyr's recommendations during the latter part of the alleged conspiracy, to operate in the same manner, telling Norris among other things, "You sort these tires out for me according to the repairables, and I can take care of you." And for this cooperation, he paid Norris from time to time various sums in cash, which Norris estimated on the trial had aggregated up to $200. Norris' conscience, however, seems to have bothered him, and after he had been working for some months he went to Fruehauf's manager and told the latter what was going on. As a result of this disclosure, an investigation was made, a grand jury examined the situation, and the present indictment was returned.

Peters' participation in what was going on at the central station is clearly shown by a number of facts. Among these are that Peters, as previously mentioned, had persuaded Lechnyr or agreed with him that Lechnyr should pocket the money from all tires sold; that Peters brought defendant Reed (plead guilty) to the central station to introduce him to Lechnyr, in order to assist Reed to buy, and Lechnyr to sell, usable tires (Reed thereafter purchasing from Lechnyr several hundred truck tires and several hundred passenger-car tires, which he resold and shipped to tire dealers without having any of them repaired or recapped); that Peters, after his boot and reliner business was well along, opened up a second establishment (in another's name), to deal in usable tires, and procured usable tires from the central station for the purpose of reselling; that Peters at one point in his relations with Lechnyr made an unsecured "loan" of $1500 to Lechnyr (whose salary was $190 a month), for which Lechnyr gave him a simple "I.O.U.", with the understanding that part of the amount at least should be paid in tires from the central station; and that the scope of Peters' usuable-tire activities was such that he had paid a recapping firm (in which one of the acquitted OPA officials was interested), during a six-months period, for recapping work done on tires in which he was dealing, the sum of $20,000 (and this price was a discounted one because of the volume).

On the confederation of defendant Phelps and defendant Hicks (the two convicted OPA officials) in the misdoings at the central station, the record shows that both were on such terms with Peters in their official relations with him that they were visitors on various occasions in his home. Neither of them, as has been indicated, ever took any steps to revoke Peters' deputy-tire-examiner letter, after they came to occupy the positions originally held by the two acquitted OPA officials who had issued the letter. Each in turn had direct charge of the staff of tire examiners for the district office, and the evidence of infrequency of examination at the central station, despite the station's relative proximity to the office and the heavy volume of inspection and reinspection work in which it was known to be engaged,[8] was such that a jury, in the light of the whole situation, could find that the regular sending of tire examiners to the central station was intentionally being avoided. True, the staff of tire examiners in the office was shown to be small because of the man-power shortage, and Phelps and Hicks both ascribed this as the reason for not having had more examinations made at the station, but on all the circumstances[9] and relations[10] in-

[8] Thus, Fruehauf's manager, who did not know of Lechnyr's and Peters' tire activities, had called Phelps or Hicks from time to time in order to have some of the accumulations of scrap tires removed from the Fruehauf premises.

[9] As an illustration of the circumstances which the jury was entitled to view in context, one tire examiner from the district office testified that, while on a few occasions he had been directed to go to the central station, he had been kept most of the time on clerical work in the office, though drawing his tire-examiner's salary. Phelps and Hicks testified that this had been done because of a shortage in office help.

[10] The personal and social relations of Phelps and Hicks with Peters have previously been alluded to. Their financial relations are subsequently discussed.

volved the jury was not required to accept this as an absolute explanation.

Of possible relevance too in appraising whether Phelps and Hicks were knowingly lending assistance to what was going on at the central station, the record shows that defendant Reed (plead guilty), in selling the tires which he obtained at the central station to other dealers, made application for authorizations of transfer, which the regulations required for any transfer of usable tires from one dealer to another, and that these applications went through Phelps' or Hicks' office, apparently without any inquiry as to where the tires had been obtained, and a part of the authorizations at least were signed by one or the other of them personally. (Peters seems to have felt sufficiently secure or independent, so that his tire company, according to some of the evidence, did not even bother to obtain authorizations of transfer for the tires sold to other dealers, until after Norris' exposure.)

Along with these general circumstances, there had been also a direct pecuniary aspect in both Phelps' and Hicks' relations with Peters, which, in terms, nature and setting, the jury could properly regard as not reflecting mere commercial dealing and which it was entitled to rubricate into position and significance in the general situation.

Phelps, some months before Norris' disclosures, wanted $5,000 with which to pay off the balance of the purchase price on a small hotel that he and his wife had contracted to buy. A bank in the town where the hotel was located, which was handling the matter for the vendor, offered to make the loan, but Phelps declared that he was certain he could get the money from a friend, "with a very low rate of interest or maybe none at all." Peters promptly furnished the $5,000, taking no security when he turned the money over to Phelps and receiving no note and mortgage from Phelps until several months later—after Norris' disclosures were made. The interest rate provided for in the note and mortgage was lower than that at which the bank had been willing to make the loan. (Phelps claimed that the execution and delivery of the loan papers had been allowed to wait until a title question was cleared. The mortgage ultimately given to Peters, while signed by Phelps' wife, appears never to have been validly acknowledged by her.)

At about this same time, Hicks also wanted money, with which to buy a home in Minneapolis so he could move his family from outstate. The purchase price of the house was $10,300. Peters supplied the $10,000, taking no security at the time but being furnished, however, within a relatively short time, with a note and mortgage, signed by Hicks and his wife, which he recorded. The loan papers provided for the same low interest rate as those of Phelps. The record further shows that when Hicks heard of Norris' disclosures and that Norris had said among other things that Peters had bought Hicks a $10,000 house Hicks arranged for a conference at Peters' office, to which Lechnyr brought Norris. This was before the Government began its investigation. Peters and Hicks quizzed Norris and sought particularly to impress upon him that Peters was holding a mortgage from Hicks. In the course of the conversation, however, according to Norris, Hicks made the observation, "If this ever gets out, it will be the biggest scandal in the Northwest."

In considering the situation, the jury could be interested too in Peters' ready affluence, as evidenced by his dealings with Phelps and Hicks—generally perhaps in relation to the fact that when Peters commenced his tire activities the year before it had been necessary for him to get someone to finance completely the purchase of the initial equipment, but more particularly doubtless in relation to Phelps' and Hicks' knowledge of his current financial condition (they both naively testified that the reason Peters made them the loans was that he was looking for investments). On Peters personally, the jury hardly could be expected to have much doubt as to the purpose and basis of the loans. When he was asked in his early conversation with the Government's investigator whether he would have made the loans if Phelps and Hicks had not been OPA officials, he had replied (his declaration being received, of course, only against himself): "What do

you think I am? Well, they wanted the money and they had control of my business. I am operating under OPA regulations [11] and if the occasion arose when I needed their assistance I wanted to be able to call upon them for a favor." And he later added, "I have been buying up Government men all my life." There was evidence also clearly showing Lechnyr's understanding with Peters on the point, for Norris testified that, in a conversation which he had with Lechnyr during the course of the activities at the central station, Lechnyr had made reference to Peters' relations with Hicks and had said that Peters "had it all fixed up" but that this was to be kept "mum" and was not to be mentioned to anyone.

Turning to the contentions for reversal, it is first argued that the evidence is insufficient to support a conviction as to any of the defendants, and that the trial court erred in not sustaining the motion of each of them for a directed verdict of acquittal.

We have merely set out some of the high lights of the Government's evidence in the case, without presuming, of course, to detail all the incidents and circumstances in the 3400-page record. As to Lechnyr and Peters, further discussion is hardly necessary of the jury's right to find that they, at least, had conspired to thwart the rationing program, to enable them to acquire and deal in usable tires in violation of the regulations. On Phelps and Hicks, as could be expected, the evidence to show their relationship to the conspiracy is not quite so blunt, but the situation and the circumstances still were such as to entitle the jury to find that in their personal and official relations with Peters they both knew what Lechnyr and Peters were doing at the central station; that they had assisted in the accomplishment of this unlawful purpose by avoiding sending tire examiners regularly to the central station and in other ways also closing their official eyes; that the loan to each, at the same period in the conspiracy, after the success of Peters' operations, to enable each to acquire property, with its low interest rate, its unconventional handling (no concurrent security to Peters) and its abnormal standards (in

Hicks' case a $10,000 loan on a $10,300 purchase price), was intended and accepted as a reward for their cooperation; and that the entire picture was such as to produce the conviction that they had an understanding with Peters, either express or implied, and thus had been parties to the conspiracy.

■ It is unnecessary to go beyond the misdoings at the central station and their attending circumstances to sustain the present verdict. We do not mean to imply that the Government did not prove that the conspiracy had a greater scope, but the evidence in relation to the central station is sufficient to establish a conspiracy within the charges of the indictment as against all the defendants whom the jury convicted, and that is as far as we need go in testing the verdict. Cf. Moss v. United States, 6 Cir., 132 F.2d 875, 878; Safarik v. United States, 8 Cir., 62 F.2d 892, 896, 897, rehearing denied 8 Cir., 63 F.2d 369. Activities at the central station are included in the overt acts set out in the indictment and established by the evidence.

■ It is perhaps trite here to repeat that under the federal statute conspiracy is a joining of intentions to engage in or further some unlawful action together, plus the taking of any step by one or more of the parties toward effecting the mutual object. 18 U.S.C.A. § 88; Marino v. United States, 9 Cir., 91 F.2d 691, 693, 694. Such a joining of intentions into a conspiracy may, and ordinarily only can, be established by inference from evidence of relationships and conduct and other probative circumstances. Parente v. United States, 8 Cir., 82 F.2d 722, 725. Thomas v. United States, 8 Cir., 156 F. 897, 910, 84 C.C.A. 477, 17 L.R.A.,N.S., 720. Once there is satisfactory proof that a conspiracy has been formed, the question of a particular defendant's connection with it may be merely a matter of whether the stick fits so naturally into position in the fagot as to convince that it is part of it. It is therefore possible for the circumstances on an individual defendant's participation in an established conspiracy to become substantial from their

[11] We have indicated in some measure how Peters was operating "under" the regulations.

weight in position and context, though in abstraction they may seem only slight. Cf. Galatas v. United States, 8 Cir., 80 F.2d 15, 24; Marx v. United States, 8 Cir., 86 F.2d 245, 250. And, of course, a defendant can join a conspiracy at any time and may be found to have done so when, with knowledge of its existence, he has undertaken to further its design. Thomas v. United States, 8 Cir., 156 F. 897, 912, 84 C.C.A. 477, 17 L.R.A.,N.S., 720; Allen v. United States, 7 Cir., 4 F.2d 688, 691; Parnell v. United States, 10 Cir., 64 F.2d 324, 327.

■ These and other general principles applicable are familiar law and need not further be restated. On the basis of them, however, we have no right to hold other than that the evidence was sufficient to entitle the jury to return a verdict of guilty against each of the convicted defendants. It is not for us, on an appeal from a conviction, to weigh the conflicting facts, circumstances and inferences of the trial proceedings, but only to consider whether the evidence in its most favorable aspect to the Government is legally capable of allowing a jury to become persuaded of guilt. Miller v. United States, 8 Cir., 138, F.2d 258, 259; Braatelien v. United States, 8 Cir., 147 F.2d 888, 893.

The second contention that is made has application only to defendant Peters. It is urged that, under 50 U.S.C.A.Appendix, § 922 (g), Peters was entitled to immunity from prosecution and that the trial court accordingly erred in refusing to sustain his motion to dismiss on this ground at the close of the Government's case and his equivalent motion for a directed verdict at the close of all the evidence. The basis of his claim to immunity was that he had been served with administrative subpoenas, after Norris' disclosures, requiring the production of the records of both his boot and reliner business and his separate tire business; that he had furnished the OPA investigator with these records; that the Government had used part of the records as evidence in the present proceeding; and that he thus had been compelled to produce evidence against himself. The records,

however, had been produced by him without requiring that he be placed under oath in their production.

Section 922 (a) and (c) of 50 U.S.C.A. Appendix, part of the Emergency Price Control Act as amended, authorizes the Price Administrator among other things to obtain such information as he deems necessary or proper to assist him in the administration and enforcement of the Act and for this purpose to require any person by subpoena to appear and testify or to appear and produce documents, or both. It is further provided in subsection (g) that "No person shall be excused from complying with any requirements under this section because of his privilege against self-incrimination, but the immunity provisions of the Compulsory Testimony Act of February 11, 1893 (U.S.C., 1934 edition, title 49, sec. 46) shall apply with respect to any individual who specifically claims such privilege."

The Compulsory Testimony Act of February 11, 1893, 27 Stat. 443, 49 U.S.C.A. § 46, had contained the following language: "No person shall be excused from attending and testifying or from producing books, papers, tariffs, contracts, agreements, and documents before the Interstate Commerce Commission, or in obedience to the subpoena of the commission, * * * on the ground or for the reason that the testimony or evidence, documentary or otherwise, required of him, may tend to criminate him * * *. But no person shall be prosecuted * * * for or on account of any transaction, matter or thing, concerning which he may testify, or produce evidence, documentary or otherwise, before said commission, on in obedience to its subpoena * * *." [12]

In United States v. Armour & Co., 142 F. 808, Judge Humphrey of the District Court for the Northern District of Illinois construed the Compulsory Testimony Act as being intended to provide immunity for any furnishing, on the Government's request, of information which might be incriminative, oral or documentary, whether produced under subpoena and oath or not. Strong criticism immediately arose of this construc-

---

[12] Interstate Commerce Commission v. Baird, 194 U.S. 25, 24 S.Ct. 563, 48 L. Ed. 860, held the Compulsory Testimony Act valid, as sufficiently satisfying the guaranty of the 5th Amendment against involuntary self-incrimination.

tion as overextending the language and purpose of the statute. "Acting swiftly to correct the error of the Armour decision, the President recommended that 'the Congress pass a declaratory act' to set aside Judge Humphrey's misconception of congressional purpose. Message from the President of the United States, April 18, 1906, H. Doc. No. 706, 59th Cong., 1st Sess., p. 3. In so doing, President Theodore Roosevelt was acting upon the advice of Attorney General (soon to become Mr. Justice) Moody. * * * The [recommended] legislation was responsive to the Government's position, as stated by Attorney General Moody: 'Upon these facts [in the Armour case] the Government contended that the statutory immunity could be conferred only upon persons subpoenaed * * who might subsequently give testimony or evidence (in the legal sense of those terms) * * *. H. Doc. No. 706, 59th Cong., 1st Sess., p. 7." (From the dissenting opinion of Mr. Justice Frankfurter in United States v. Monia, 317 U.S. 424, 437, 438, 63 S.Ct. 409, 415, 87 L.Ed. 376.)

Within approximately three months after the decision in the Armour case, Congress passed and the President approved Public Law No. 389, 34 Stat. 798, 49 U.S.C.A. § 48, which was entitled "An Act Defining the right of immunity of witnesses under the Act entitled 'An Act in relation to testimony before the Interstate Commerce Commission,' and so forth, approved February eleventh, eighteen hundred and ninety-three * * *." The body of the Act provided "That under the immunity provisions in the Act entitled 'An Act in relation to testimony before the Interstate Commerce Commission,' and so forth, approved February eleventh, eighteen hundred and ninety-three, * * *[13] immunity shall extend only to a natural person who, in obedience to a subpoena, gives testimony under oath or produces evidence, documentary or otherwise, under oath."

 Congressional intention could hardly have been made more definitely to appear. From the legislative history and the language used in the title and the body of Public Law No. 389, the purpose of the Act plainly was to express the legislative concept of the scope of the immunity provisions of the Compulsory Testimony Act of February 11, 1893,[14] in order to eliminate the possibility of any further misconstruction or extension such as had been made in the Armour case. There was no attempt to change the language of the statute in any way; a declaration was simply made of what Congress believed that the immunity provisions in the Compulsory Testimony Act had always meant and implied. A court could not thereafter regard the language of the Act as having any greater implication, and it certainly would have no basis or excuse to repeat the misconstruction made in the Armour case.

And yet Peters is here asking us to do just that. He argues that he was entitled to immunity even though the records which he furnished to the OPA investigator were not produced under oath. As we have pointed out, Public Law No. 389, 34 Stat. 798, 49 U.S.C.A. § 48, declares that Congress meant the immunity provided for in the Compulsory Testimony Act of February 11, 1893, to "extend only to a natural person who, in obedience to a subpoena, gives testimony under oath or produces evidence, documentary or otherwise, under oath". Thus—to reemphasize—as a matter of legislative intention there is no foundation for a claim of immunity under the Compulsory Testimony Act if a person produces incriminating documents or other evidence, without requiring that he be subpoenaed and that he be placed under oath in connection with the production. The requirement cannot be said to be so restrictive and unreasonable as to be invalid, and its wisdom, of course, is not a matter for our consideration. It is possible that, among other things, Congress may have intended the insistence by a person that he be sworn in producing documents or other evidence as a flag in administrative investigation, to

---

[13] The definition or declaration in the Act was also made applicable to similar compulsory testimony or evidence provisions in certain other statutes, such as the Sherman Anti-Trust Act. See 34 Stat. 798.

[14] And, of course, the similar statutes referred to in Footnote 13, which have been omitted from the quotation.

avoid the inadvertent prejudicing by some agency of the Government's rights on a possible criminal aspect, without due consideration and reference in selecting its course.

But we should perhaps more fully state the basis of Peters' argument in the present situation. He contends that we should ignore Public Law No. 389 here, because it has been made a separate section in the United States Code (49 U.S.C.A. § 48) and no reference is made to it in the section (50 U.S.C.A.Appendix, § 922(g)), which incorporates the immunity provisions of the Compulsory Testimony Act into the Emergency Price Control Act. Section 922(g), which has previously been quoted, provides that the privilege against self-incrimination shall not excuse anyone from furnishing information or evidence under the Emergency Price Control Act, "but the immunity provisions of the Compulsory Testimony Act of February 11, 1893 (U.S. C., 1934 edition, title 49, sec. 46), shall apply with respect to any individual who specifically claims such privilege." The simple parenthetical reference to "(U.S.C., 1934 edition, title 49, sec. 46)", without mention of 49 U.S.C.A. § 48, can hardly soundly be said to have been intended by Congress to exclude consideration of the latter section in relation to the meaning of the immunity provisions of the Compulsory Testimony Act. With or without a specific reference to 49 U.S.C.A. § 48, we do not believe that any court, as we have already emphasized, after the congressional declaration, would have a right in any situation to construe the immunity provisions of the Compulsory Testimony Act as meaning what the Armour case had assumed them to mean—which, we repeat, is what Peters is asking us to do here.

It may be added also that, if the reference in the Emergency Price Control Act to the particular codification, "U.S.C., 1934 edition, title 49, sec. 46", might otherwise be argued to have some exclusionary significance, it further is to be noted that the codifiers themselves took occasion to point out the inescapable relationship between section 46 and section 48 of title 49 of their codification, by inserting under the text of section 46 the reference and caution "See section 48 of this title." Thus, there is not even the slighest basis to contend that either the codification or the reference in the Emergency Price Control Act to section 46 of the codification sought in any way to divorce section 46 from section 48, if such a thing had been possible. And, any mechanical divorce in codification or reference which might have occurred would not in any event have permitted a court to return to the misconstruction of the Compulsory Testimony Act made in the Armour case.

■ We hold that Peters was not entitled to claim immunity under the provisions of the Compulsory Testimony Act, as incorporated in the Emergency Price Control Act, on the basis of any documents which he furnished to the OPA investigator, because he had not required that he be placed under oath in producing the documents.

■ The Government has urged other reasons also why Peters was not entitled to immunity. Most of the documents furnished to the OPA investigator by Peters appear to have related to the boot and reliner business. The subpoena issued for these documents ran not against Peters but against "Greta O. Peters dba Island Manufacturing Company". Island Manufacturing Company was the trade name under which the boot and reliner business was being operated, and a trade-name certificate, filed under the statutes of Minnesota, purported to declare that Greta O. Peters, who was Peters' wife, was the sole owner of the business. Under the immunity provisions of the Compulsory Testimony Act and their incorporation in the Emergency Price Control Act, there clearly could be no claim to immunity for producing documents, unless the documents were produced under the compulsion of a personal subpoena. A subpoena against Greta O. Peters could hardly create any legal compulsion against Peters, and his furnishing of documents relating to the boot and reliner business, because of that subpoena, would therefore not afford him any basis for a claim of immunity under the Compulsory Testimony Act.

The only subpoena directed to Peters personally related to the used-tire business and ran to "Greta O. Peters and Cloyce Henry Peters, doing business as Nelson Tire Company". It commanded them to produce all the business records of the Nelson Tire Company from January 1, 1943, to January 29, 1945, "including ledgers, journals, check books, cancelled checks, bank statements, stock books, inventory records and all other books and records, bills of lading, purchase invoices, sales invoices, delivery tickets and receipts, receipts and records showing cash paid out and copies of all correspondence to or from your sellers and buyers." Appellants' brief does not identify for us by exhibit number more than two documents, 41-A and 41-B, as having been produced under this subpoena, and these were cancelled checks issued in payment of recapping work done on usable tires. The brief, in discussing together the documents produced for the two businesses of Peters, identifies a total of five documents by their exhibit numbers and then speaks generally of "various freight bills, bills of lading and other records that were received in evidence at the trial", but it does not tell us whether these relate to the boot and reliner business or the tire business, and it does not assist us to identify them by giving their exhibit numbers or the pages in the record where they occur.

As a matter of fact, in order to save expense on the appeal, apparently not all the exhibits have been copied into the transcript, which presumably accounts for the indefinite reference in the brief to "various freight bills, bills of lading and other records" of the trial proceedings. The Government's brief says generally that the freight bills and bills of lading relate only to the boot and reliner business. While the point is not of importance, in view of our holding that Peters is in any event not entitled to immunity under the provisions of the Compulsory Testimony Act, because he did not require that he be placed under oath in producing any documents, it may not be amiss to add that, without some help in identification, it would hardly be reasonable to expect us again to page through a 3400-page record merely to see if it is possible for us to figure out and locate what particular exhibits counsel may have had in mind in their argument.

The Government further contends that the documents which Peters produced under the compulsion of his tire-business subpoena were all records which the law required him to keep and that the privilege against self-incrimination therefore could not at all be claimed in their production. Of course, the privilege against self-incrimination cannot be claimed in the production of documents which the law requires to be kept as a matter of public regulation.[15] Cf. Wilson v. United States, 221 U.S. 361, 381, 31 S.Ct. 538, 55 L.Ed. 771, Ann.Cas. 1912D, 558; Bowles v. Glick Brothers Lumber Co., 9 Cir., 146 F.2d 566, 570, 571; Porter v. Mueller, 3 Cir., 156 F. 2d 278, 280, 281. No regulation, however, has been called to our attention that necessarily would bring the two checks themselves, Exhibits 41-A and 41-B, issued in payment of recapping work done, (which, as we have indicated, are the only two documents specifically identified for us as having been produced from the files and records of the tire business) within the required-records doctrine. But it is unnecessary to explore the matter further, in view of our holding that the right to immunity cannot in any event here be claimed to exist.

The Government has also argued that, even if Peters otherwise might have been entitled to immunity under the provisions of the Compulsory Testimony Act, he waived that right by failing to make such an assertion of his privilege against self-incrimination at the time the documents were produced as was required by 50 U.S. C.A.Appendix, § 922(g). This section, in making the immunity provisions of the Compulsory Testimony Act applicable to the Emergency Price Control Act, and thereby preventing the stymying of price-control investigations through a claim of the privilege against self-incrimination,

---

[15] It should hardly be necessary to remind that the required-records doctrine, of course, has no relationship to the scope of an investigating subpoena but merely to the applicability of the privilege against self-incrimination.

adds the qualification that they shall apply only "with respect to any individual who specifically claims such privilege."[16] In other words, under the Emergency Price Control Act, to entitle one to immunity from producing documents, he must have produced the documents under the compulsion of a subpoena and he must have required that he be placed under oath in their production, as provided by the Compulsory Testimony Act of February 11, 1893, and he must beyond this, at the time of the production, also have specifically claimed his privilege against self-incrimination.

Peters testified that, when the Government's investigator handed him his subpoena, he called his attorney on the telephone, and, after talking with the latter, he told the investigator, "Mr. Smilow [the attorney] advised me if you have subpoenas the only thing I can do is furnish you with the books and records that you ask for, but he told me not to waive any rights." Peters' bookkeeper, who was shown to have been present at the time, was not called upon to corroborate Peters as to this incident. The Government's investigator testified that he did not remember whether Peters had telephoned his attorney or not, but that Peters did not "claim immunity" in connection with any document that he turned over to the investigator.

■ There is, of course, no prescribed or crystalized formula for claiming the privilege against self-incrimination. The provision in 50 U.S.C.A.Appendix, § 922 (g), (and in other recent statutes)[17] that the privilege against self-incrimination must be "specifically" claimed, would seem to imply, however, that there must be some expression directly indicative of the intention to claim the particular privilege, as distinguished from other possible rights, and reasonably communicative of the fact that this is what is being done.

Whether Peters' statement to the investigator, if made, that his lawyer had told him "not to waive any rights" was intended, or was sufficiently communicative, to constitute an assertion of the privilege against self-incrimination, under the requirement in section 922(g) that the privilege must be specifically claimed is at least debatable. Since the trial court did not make any finding, on the basis of Peters' credibility and the other circumstances in the situation, whether the statement had in fact been made, or any expression on whether it regarded the statement, if found to have been made, as sufficiently specific in the particular situation, and since we have held that for other reasons Peters' claim of immunity is not entitled to be recognized, we shall not undertake to resolve the question posed by the Government's contention.

■ Appellants' next contentions relate to rulings on the admission and rejection of evidence. Most of them are so clearly without reversible substance that we shall not take the space to discuss them. As an illustration, complaint is made of the receiving in evidence of a letter written by one of the acquitted defendants, as not being actually an admission against interest. But the letter (after deletion of a part of it by the court) was received only against the particular defendant, and the jury was again told generally in the instructions that it could be considered only for that purpose. Any possible error in the admission of evidence, received solely against a specific defendant in a conspiracy case, is generally immaterial, where that defendant is acquitted. Hyde v. United States, 225 U.S. 347, 378, 381, 32 S.Ct. 793, 56 L.Ed. 1114, Ann.Cas.1914A, 614.

■ The admission of testimony on the part of the Government's investigator as to his conversation with defendant Peters regarding the contents of a letter written by Peters' attorney (which Peters of his own accord had produced at the time, and which purported to express his attorney's views on his financial deal with defendant Phelps), and Peters' comments on the letter, is complained of. The court re-

---

[16] As to the effect of the absence of this qualification in the Compulsory Testimony Act itself, see United States v. Monia, 317 U.S. 424, 63 S.Ct. 409, 87 L.Ed. 376.

[17] For a reference to these statutes, see the dissenting opinion in United States v. Monia, supra.

fused to admit the letter itself as incompetent but held that Peters' statements regarding the letter and his comments on it were clearly competent against him. A party's statements are always competent evidence against him unless they fall within some special exclusionary rule. Where they have been received in evidence, the fact that they may have only remote relevance to the issue being tried is not ground for reversal, unless they are such as are clearly apt to have confused the jury's mind or to have improperly swayed its judgment. Peoples Loan & Investment Co. v. Travelers Ins. Co., 8 Cir., 151 F.2d 437, 440. As the Supreme Court has said, "much discretion is left to the trial court [in a conspiracy case], and its ruling [on the admission of evidence] will be sustained if the testimony which is admitted tends even remotely to establish the ultimate fact." Clune v. United States, 159 U.S. 590, 592, 593, 16 S.Ct. 125, 126, 40 L.Ed. 269. Here, Peters' statements and comments on his attorney's letter at least showed that he had not regarded the loan to Phelps as constituting an ordinary commercial transaction.

The statements and comments of Peters, having been made after the conspiracy was broken up, could not, of course, have been admitted against any of the other defendants, nor were they. Cf. Fiswick v. United States, 67 S.Ct. 224, 227; 11 Am. Jur., Conspiracy, § 41, p. 574. While, in ruling on one of the repeated objections of the defendants, the court seems inadvertently to have said at one point, "The evidence may be admissible as to the defendant Phelps", instead of Peters, it had made it clear in previously receiving a part of this evidence that it was being admitted solely against Peters, and the instructions again emphasized to the jury that "the statements made by Peters were received as evidence against him only and not against the other six defendants." In this situation, we do not believe that any improper confusion or prejudice can legitimately be claimed to have resulted as to any other defendant.

The ruling on evidence most strenuously attacked is the exclusion of some testimony on the part of witness Colonel Bryon Houston. Houston for a time had been detailed by the Under-Secretary of War to serve in the OPA and, during part of the period covered by the alleged conspiracy, had served in the national office as Deputy Director in charge of rationing. The defendants sought to have him relate the many problems of OPA operations. He testified among other things that there had been appointments made of deputy tire examiners throughout the country, though there was no express provision for them in the regulations, but he later explained that these letters of appointment were issued "to any people of peculiar or necessary skills that we had to borrow from private life to carry on the program." (It could hardly be contended here that there had been any such "borrowing" of Peters.) He made reference to other practices also that were not covered by the regulations.

Defendants then further attempted to have him relate what he had said in a speech made by him in December 1943 at St. Paul to the OPA district staff. The court excluded this testimony. Defendants thereupon offered to prove that "this witness [in that speech] instructed the staff of the District Office * * * that no rationing program such as undertaken could be by any fixed policies or rules administered successfully nationally, but that such a pattern, to use the witness' expression, would have to be varied and changed to meet with the peculiar local conditions and emergencies in various parts of the country; and that it was the duty and the obligation of such local rationing executives and OPA executives when confronted with such a situation, to meet it regardless of regulations and regardless of theretofore existing practice and interpretations, and that they should use common sense in their meeting it and solving it, and if the rules or regulations did not cover the situation, to disregard that fact; or if the rules and regulations or practice theretofore or at that time existing prohibited, to disregard such rules and regulations and practice and to put aside the rule books, the rule and regulation book, and to solve it on a practical common sense basis."

It is argued that this went to prove instructions by a superior to his subordinates,

which all of the defendant OPA officials would be bound to follow, and that it therefore was evidence bearing upon the issue of criminal intent. But the witness did not and, of course, could not repeal the OPA regulations in his itinerant "pep" talk at St. Paul, nor did he or could he authorize anyone to throw official responsibility into the waste basket. That common sense and practical judgment were required to be exercised generally in dealing with OPA problems, as with anything else, no one who has had experience in the court room can doubt that a jury would understand. And that the jury had thus understood the situation is, we think, indicated by the acquittal of the two OPA officials who had been responsible for the formulation of the American Legion scrap plan, the establishing of the central re-inspection station, and the issuance of Peters' letter of appointment as deputy tire examiner. The "pep" talk of Colonel Houston was sufficiently remote in any relevance on the issue of conspiratorial intent that the question of its admission or exclusion was wholly one for the discretion of the trial court.

■ Complaint is also made of the exclusion of various bulletins and communications from the Chicago regional office and the national office dealing with rationing problems. These similarly were of such remoteness that the trial court was entitled to exercise its discretion in admitting or excluding them. Two illustrations will suffice to demonstrate.

In Exhibit RRR, a bulletin addressed to district rationing executives by the regional rationing executive of the Chicago office, under date of November 9, 1943, a 7-page discussion was made of the tire situation generally, in which occurred the following statement: "The only Grade III tires that are now going into dealers' stocks are the tires traded in on the sales of Grade I tires. It is estimated that, with the sale of each one hundred (100) Grade I tires, forty (40) Grade III tires are made available for distribution from those tires turned in." It is argued that this constituted corroboration of appellants' contention that tires properly examined and condemned under the regulations included repairable and re-usable tires and hence of the fact that Lechnyr and Peters were dealing only in rightfully condemned tires. But any such corroboration was speculative and remote, for the bulletin did not ascribe the estimated result to the standards governing condemnation any more than it could be said to have ascribed it to the self-interest of dealers in making inspections, or to the incompetency or lack of equipment of tire inspection stations, or to the failure to have re-checks made by tire examiners. And the general standard under the regulation was, as we have indicated, that a tire was not to be replaced if it was "capable of being used, or capable of being repaired for use" by the owner.

Again, in Exhibit VVV-2, which was a memorandum from the Chief of the Tire Rationing Branch of the national OPA office, it was stated: "It is the duty of every tire repair man and every recapper to get every mile possible out of every tire that comes to his attention. The limit of the size of the repair that any recapper or repair man can fix depends entirely on his ability as a mechanic. The Standards, set up by the Office of Price Administration, which state that tires are repairable and recappable if they do not have more than two sectional repairs, and if the cuts or breaks are not more than three inches in length, are meant to serve only as a guide. All repair men cannot be asked to repair all kinds of breaks and defects; therefore, we had to be conservative in our limits. We know that there are hundreds of repair men who can do many things to a tire to get many more miles of wear out of it, so why limit them when they are able to do the work? We suggest that you and the field men encourage the repair men to do everything possible to make tires run longer if the mileage received justifies the expense of the repair."

The brief argues that "This communication shows that the OPA themselves were cognizant of the fact that tires which had been condemned within the regulations could nevertheless be repaired." But the memorandum simply calls attention to the fact that the general tests designed to cover usability were minimum standards, intended to cover tires that were deemed to be beyond the skill and facilities of the ordinary

tire-repairer, but that, of course, there would be repair men of special skill who might be able to do "things to a tire to get many more miles of wear out of it" and that this should be encouraged if it was justified by the expense. How this suggestion could constitute corroboration that Lechnyr and Peters had not dealt in tires that were improperly condemned, it is difficult to see. But if it could be said to have been in any way corroboration, it was sufficiently remote so that the admission or exclusion of the memorandum was a matter for the trial court's discretion.

Appellants' next series of contentions involve instructions given by the court and requested instructions refused. All of the contentions have been examined and none of them is such as to entitle appellants to a reversal. Only a few of them will be commented on, because of the already too-extended length of this opinion.

■ Complaint is made because the court instructed the jury that neither Lechnyr nor any of the other defendants had title to or the right to sell the tires disposed of by Lechnyr and Peters. This instruction was given because Lechnyr had remarked in his testimony that he felt that he had such a right. The suggestion is made here that Lechnyr could have acquired title to the tires by abandonment. That, however, is simply an attempt to brood a mechanical theory into this appeal. We are convinced that, on the evidence and the instructions, the jury fully understood the practical question of title which the situation presented in relation to the matter of criminal intent. And the separate counsel for each of the several defendants seem also to have understood it and to have been satisfied at the time with the court's submission of it, for they tendered no instruction on any claim of title by abandonment nor did they take any exception to the part of the charge of which they now complain. We need not notice the argument on the point further. Cf. Joyce v. United States, 8 Cir., 153 F. 2d 364, 368. The same is true of the arguments made on other parts of the court's instructions to which similarly no exceptions were taken. None is of such substance as to command consideration, on the ground of manifest injustice, notwithstanding the failure to except.

■ The contentions made on the court's refusal to give requested instructions involve such tendered instructions as these: "That there is no Office of Price Administration regulation that imposed upon a district rationing representative or a district rationing executive the duty of personally examining or releasing any turn-in tires", and "That the mere fact that a defendant or defendants has an isolated business transaction with another defendant in the form of making or receiving a loan, is not of itself, standing alone, sufficient to constitute or make such person a conspirator or guilty of conspiracy within the meaning of the statute or as charged in the indictment." The refusal of these requests hardly calls for any elucidation here. There was no contention that Phelps or Hicks owed the duty of personally examining tires; and the elements which the jury was required to find in order to entitle it to convict were fully covered by the court's general instructions.

■ There was one requested instruction which contained the following: "That the defendants in this case are charged with having entered into an agreement to defraud the United States by corrupt administering and procuring corrupt administration of the Office of Price Administration regulations relating to rationing of tires. Therefore, if you should find from the evidence that said defendants or two or more of said defendants conspired to commit a different or disconnected conspiracy or conspiracies other than alleged in the indictment, it will be your duty in such case to find the defendants not guilty as charged herein." The court's instructions had fully informed the jury of what was necessary to establish the conspiracy charged or a joinder in that conspiracy, as against any of the defendants, and had further added that "If the Government has established these facts beyond a reasonable doubt, you should return a verdict of guilty against the defendant or defendants who were members of the conspiracy and who acted with criminal intent", but that "If any defendant did not become a member of

the conspiracy as alleged in the indictment, your verdict as to such defendant should be not guilty", and "A finding that the defendant participated in the conspiracy must be based on evidence that convinces you beyond a reasonable doubt and not on speculation and conjecture." We think all this made it sufficiently clear to the jury that it could convict only of a single conspiracy, such as the indictment charged, and that any defendant whom it convicted must be found to be a party to that and not some other or separate conspiracies. Under these circumstances, the court was not required to give the requested instruction. As we have previously indicated, the evidence here was sufficient to support a finding of a single conspiracy, within the charge made in the indictment, on the part of all the convicted defendants. This is not a case, such as Kotteakos v. United States, 328 U.S. 750, 768, 66 S.Ct. 1239, 1249, 90 L.Ed. 1557, where, as to the convicted defendants, it can be said that "The jury could not possibly have found, upon the evidence, that there was only one conspiracy."

None of appellants' numerous assignments of error entitles any of them to a reversal, and the judgment as to each of them is affirmed.

THOMAS, Circuit Judge.

I concur in the opinion prepared by Judge Johnsen in this case; but in respect of defendant Peters' contention that he is entitled to immunity under 50 U.S.C.A. Appendix, § 922(g), I am persuaded that the point is covered by the required records doctrine. The only documents produced by him in response to the subpoena served upon him about which there could be the slightest question were exhibits 41-A and 41-B. These exhibits were two Nelson Tire Company checks to cash endorsed: "for repairing and recapping tires."

Section 1011 of Ration Order 1-A, Tires, Tubes, Recapping, etc. (7 F.R. 9160), requires "All records relating to tires and tubes shall be available at all times for inspection by the Office of Price Admin-

istration"; and Section 1315.1258 of Revised Price Schedule No. 87 provided: "Records: Every person making sales or purchases of scrap rubber subject to this schedule shall keep for inspection by the Office of Price Administration for so long as the Emergency Price Control Act of 1942, as amended, remains in effect, complete and accurate records of each such purchase or sale, showing the date, the name and address of the buyer and seller, the quantity of each grade of scrap rubber purchased or sold, and the price."

Since the Nelson Tire Company was Peters' company these checks were produced by him either voluntarily or in response to the subpoena served upon him. If for the latter reason it was because he knew they were records pertaining to his tire and tube business. Whichever is the true explanation, he was not entitled to immunity under either the statute or the Fifth Amendment. The privilege of immunity against self-incrimination does not apply to public documents in public office alone; it applies equally to any records giving information in reference to "transactions which are the appropriate subjects of governmental regulation, and the enforcement of restrictions validly established." Wilson v. United States, 221 U.S. 361, 380, 31 S.Ct. 538, 544, 55 L.Ed. 771, Ann.Cas. 1912D, 558; Davis v. United States, 328 U.S. 582, 590, 66 S.Ct. 1256; United States v. Shapiro, 2 Cir., 159 F.2d 890. These cases, I think, sustain the court's order denying Peters' claim to immunity.

RIDDICK, Circuit Judge (dissenting in part).

In No. 13,110, Phelps v. United States, No. 13,112, Lechnyr v. United States, and No. 13,113, Hicks v. United States, I concur in the result.

I am unable to concur in the conclusions reached in No. 13,111, Peters v. United States, on the question of immunity from prosecution[1] granted by section 202 of the Emergency Price Control Act, 50 U.S.C.A. Appendix, § 922.

[1] Only two other cases deal with the precise question involved here, and they reach opposite results. See United States v. Shapiro, 2d Cir., 159 F.2d 890; In re Hoffman, D.C., 68 F.Supp. 53.

By section 202(b) of the Act, 50 U.S.C.A. Appendix, § 922(b), the Administrator is authorized to require any person engaged in a business dealing with any commodity to furnish information under oath or affirmation or otherwise on demand of the Administrator, to keep the records and documents required by the orders of the Administrator, and to permit the inspection of the records required to be kept. "The Administrator may administer oaths and affirmations and may, whenever necessary, by subpena require any such person to appear and testify or to appear and produce documents, or both, at any designated place." Section 202(g), 50 U.S.C.A.Apendix, § 922(g), provides: "No person shall be excused from complying with any requirements under this section because of his privilege against self-incrimination, but the immunity provisions of the Compulsory Testimony Act of February 11, 1893 (U.S. C., 1934 edition, title 49, sec. 46), shall apply with respect to any individual who specifically claims such privilege."

The Compulsory Testimony Act of February 11, 1893, 49 U.S.C.A. § 46, provides that no person shall be excused from the production of records and documents in response to a subpoena commanding their production on the ground that the records, if produced, may tend to incriminate him or subject him to a penalty or forfeiture, but that "no person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing, concerning which he may testify, or produce evidence, documentary or otherwise," in obedience to a subpoena issued by lawful authority. If, as appellant Peters asserts, he specifically claimed the exemption provided by the Act of February 11, 1893, we may not deny his claim of immunity from prosecution because he was not sworn or because of the "required records doctrine", unless we read into the Act something that Congress declined to put in it.

It must be conclusively presumed that Congress in referring specifically to the Compulsory Testimony Act of February 11, 1893, and in providing that the provisions of that Act should apply to claims of immunity of the character presented here, did so deliberately and with full knowledge of the "required records doctrine" and of the different provisions of the amendment to the Act adopted June 30, 1906, 49 U.S.C.A. § 48, limiting the immunity granted to natural persons who produced records and documents under oath. "It is not for us to add to the legislation what Congress pretermitted." United States v. Monia, 317 U.S. 424, 430, 63 S.Ct. 409, 412, 87 L.Ed. 376. The immunity granted is an immunity from prosecution. To say that in the Act Congress did not grant the immunity which the language of the Act plainly gives, because it was not compelled to do so, is but another way of saying that Congress should not have granted the immunity which it has granted, and thus to invade the legislative field.

The subpoena in response to which Peters delivered his records called not only for all "required records," but for all of the records of the Nelson Tire Company and the Island Manufacturing Company whether or not subject to inspection by the Administrator. Among the records which Peters was not required to keep and which the Administrator's agent received were a check of the Island Manufacturing Company to Dokmo, also charged as a member of the conspiracy, and Peters' records of transactions with Phelps and Hicks, convicted as members of the conspiracy.

That the subpoenas were addressed to the Nelson Tire Company and the Island Manufacturing Company is of no significance on the question of Peters' immunity. Neither of the so-called companies was a corporation. Their titles were trade names under which Peters carried on his business operations, in the case of the Nelson Tire Company the business of selling tires and tubes, and in the case of the Island Manufacturing Company the business of manufacturing boots and reliners. Under Minnesota law (Minn.St.1945 and M.S.A. § 333.01 et seq.) any person conducting a business in Minnesota under a trade name is required to file in the office of the clerk of the district court of the county in which the business is conducted a certificate setting forth the tradename adopted and the real name of the person conducting the business. Certificates were filed by both

the Nelson Tire Company and the Island Manufacturing Company showing Peters as the sole owner of the Nelson Tire Company and Greta O. Peters as the sole owner of the Island Manufacturing Company. Greta O. Peters is the wife of appellant Peters. By the Minnesota statutes, however, the certificate is only "presumptive" evidence of the ownership of the business.

In this case the indictment was drawn and the case prosecuted in the district court on the theory that appellant Peters was the owner and operator of both so-called companies. According to the Government's proof the conspiracy began with the appointment of Peters as Deputy Tire Examiner, so that Peters might acquire a monopoly of the business of processing condemned tires. Peters purchased from another the necessary equipment for the purpose of operating such a business. The indictment charged that Peters was engaged in this business and the proof shows that he was so engaged. Among the overt acts charged were the payments of money by Peters to Dokmo, Phelps, Hicks, and Lechnyr. The proof showed that these payments were made by checks of the Island Manufacturing Company signed by Peters. The subpoena requiring the production of the records of the Island Manufacturing Company was served not upon Greta O. Peters but upon appellant Peters. To say that Peters was not the Island Manufacturing Company and that its records were not his personal records is to ignore the facts which the evidence established and upon which the Government relied for conviction of those charged.

On the record in this case whether Peters specifically claimed his immunity at the time his records were produced in response to the Administrator's subpoenas was a question for the jury. Peters testified that on being served with the subpoenas he called his attorney, and on the advice received in response to the call he told the Administrator's agent that he was compelled to produce the records required by the subpoenas but that he was not to waive any of his rights. The Administrator's agent testified that he had no recollection of such a statement by Peters, but that he could not say that it was not made. There

were other witnesses present not called by either the Government or Peters. One of the witnesses was an employee of Peters and the other was an investigator representing the Administrator. Whether Peters said anything or made the statement which he claimed he made was, in the circumstances, a question of fact, never determined at the trial. If Peters made the statement to the Administrator's agent which he said he made, he sufficiently complied with the Act's requirement that he specifically claim immunity if he desired to avail himself of it.

I would reverse the judgment in No. 13,-111 and remand for further proceedings.