## HAMNER v. UNITED STATES.
### No. 10393.

Circuit Court of Appeals, Fifth Circuit.
March 29, 1943.

Rehearing Denied May 11, 1943.

Andrew M. Smith and Wm. G. B. Morrison, both of Houston, Tex., for appellant.

Brian S. Odem, Asst. U. S. Atty., of Houston, Tex., for appellee.

Before SIBLEY, HOLMES, and McCORD, Circuit Judges.

SIBLEY, Circuit Judge.

Appellant Hamner's motion to quash counts one and two of the indictment was overruled; a jury was waived, and he and two others were convicted and sentenced to fine and penitentiary imprisonment for conspiracy and for seven substantive offenses which were also charged as overt acts done pursuant to the conspiracy. Hamner alone appeals.

The motion to quash was in reality a demurrer, which included in its grounds that count one charged no crime, and that in its allegations as to the purpose of the conspiracy it was too vague and indefinite; and that count two did not charge any offense. The demurrer ought to have been sustained. The first count charged that codefendants Pace and McGurk were both automobile tire dealers, and appellant Hamner operated another sort of business; that after Jan. 30, 1941, the Office of Price Administration was under cited statutes an agency of the United States engaged in enforcing and administering regulations concerning rubber tires and tubes for automobiles, one of which promulgated Feb. 19, 1942, forbade the sale or transfer of such without certificates from local tire rationing boards. It then proceeds to allege that the three defendants, beginning March 1, 1942, and continuing to the date of the indictment did unlawfully, wilfully, knowingly, corruptly, feloniously and fraudulently conspire together, and with other persons to the grand jury unknown, to commit offenses against and to defraud the United States in the following manner: From and since the 1st of March, 1942, the said defendants have attempted to make many purchases of new rubber tires and tubes for the purpose of and with the intent of enabling the defendants to make sales and transfers thereof to consumers and other persons without receiving certificates from local tire rationing boards; and said defendants did make sales and transfers to consumers in violation of the statutes, orders and regulations hereinbefore referred to. And the Grand Jurors further charge that in the acquisition of said new tires and tubes said defendants made and caused to be made false, fraudulent and fictitious bills, receipts and vouchers relating to matters within the jurisdiction of the Office of Price Administration, being an agency of the United States. It is then alleged in the usual form that in pursuance of the conspiracy and to effect its object 23 overt acts were done, all before March 14, 1942.

Prior to the Second War Powers Act of March 27, 1942, 50 U.S.C.A. Appendix § 631 et seq. the rationing of rubber tires, and the regulations providing for rationing certificates to consumers, rested upon the brief provisions in the Act of May 31, 1941, 55 Stats., p. 236, 41 U.S.C.A. preceding § 1 note, which gave the President power to allocate materials important to the defense of the United States. This Act defined no crimes and fixed no penalties. The Emergency Price Control Act of Jan. 30, 1942, 50 U.S.C.A. Appendix § 901 et seq., besides authorizing price fixing, in Section 4 made it unlawful to sell and deliver any commodity, or to buy or receive it in the course of trade or business, in violation of price control regulations, and in Section 205(b) fixed criminal penalties therefor. Section 205(e) indicated a distinction between buyers "for use or consumption" and those "in the course of trade or business". This Act, Sect. 201(b), authorized the transfer to the Office of Price Administration therein set up of the function of priorities and rationing. No crimes or penalties were however fixed for violation of rationing regulations. The Second War Powers Act approved March 27, 1942, supplied this omission by amending in Sect. 301 the Act of May 31, 1941, so as to make the wilful violation of rationing regulations a misdemeanor. This was subsequent to the acts charged in the indictment. It is therefore argued that it was no offense against the United States prior to March 27, 1942, to buy or sell tires for consumption without a rationing certificate, and hence, if a conspiracy to do this is supposed to be charged, there is no offense against the United States in the alleged object of the conspiracy. In reply it is argued that the rationing regulations create an offense by imposing as a penalty on violators an inability to get more tires; and also that the United States would be defrauded, though the indictment does not say how. We do not pass on these doubtful questions, because we do not think the indictment with sufficient clearness charges a conspiring.

Confused allegations of what the defendants did are by a sort of inference sought to be made allegations of what they conspired to do, as respects sales of tires without rationing certificates. The next sentence beginning: "And the Grand Jurors aforesaid do further charge and present, that in the acquisition of new tires and tubes the defendants made and caused to be made false and fraudulent and fictitious bills, receipts and vouchers", takes an entirely fresh start, and charges another substantive offense rather than any sort of conspiracy. Now the gist of the charge of conspiracy is the agreement to commit an offense against or a fraud on the United States. An overt act must be done pursuant to the agreement before, under 18 U.S.C.A. § 88, the crime is complete, but its essence lies in the agreement. That agreement must be distinctly and directly alleged. Inference and implication will not, on demurrer, suffice. Aid cannot be sought in the allegations of what was done in pursuance of it. 15 C.J.S., Conspiracy, § 82; 11 Am.Jur., Conspiracy, Sect. 29; Joplin Mercantile Co. v. United States, 236 U.S. 531, 35 S.Ct. 291, 59 L.Ed. 705; United States v. Britton, 108 U.S. 199, 2 S.Ct. 531, 27 L.Ed. 698. In the present case it is alleged generally that the defendants conspired to commit offenses and frauds, but it is not alleged what offenses and frauds were agreed to be committed. The pleader thenceforth alleges only what was done. What was done is often good evidence of what was agreed to be done, but to allege such evidence is not an allowable substitute for a clear statement of the agreement which is proposed to be proven. Such pleading invites the abuse of the conspiracy statute which has often happened by stating several substantive joint offenses and seeking conviction not only for them but for a conspiracy besides. Such a thing is legally possible, but it emphasizes the necessity for clear pleading of the conspiracy agreement as a thing to be proved separate and distinct from the substantive crimes. Count one is not such a pleading.

■ Count two charges that the defendants concealed and covered up by a trick, scheme and device a material fact within the jurisdiction of the Office of Price Administration in violation of Sect. 80 of Title 18, U.S.C.A., in that they acquired new rubber tires for the purpose of reselling them without rationing certificates and at excess prices, and did knowingly so resell them; and to conceal and cover up such acquisition did surreptitiously store them on the premises of Hamner, contrary to the statutes and regulations in such case provided. Section 80 criminates "Whoever shall knowingly and willfully falsify or conceal or cover up by any trick, scheme, or device a material fact * * * in any matter within the jurisdiction of any * * * agency of the United States." The regulations did require that in the transfer of new tires from dealer to dealer a bill or receipt be taken showing the number and kind of tires transferred and the name of the transferee. Pace and Mc-Gurk, as we shall see, did make false bills, naming the transferees untruly, and so fell afoul of Section 80, but we are referred to no regulation which required the tires to be kept at any particular place or exhibited to the Office of Price Administration. It is not apparent to us that the storing of them at Hamner's place of business, whether surreptitiously or not, was any such concealment from the Office of Price Administration of a material fact as Section 80 denounces. This count charges no crime, and should be stricken on demurrer.

■ Four of the substantive counts charge violations of Sect. 80 by making false representations in a matter within the jurisdiction of the Office of Price Administration by making bills and invoices of purchased tires in which the purchaser was untruly stated. The Office of Price Administration had made regulations under which dealers could transfer new tires to dealers without rationing certificates, but there was required to be taken a receipted invoice naming the purchaser who got them, to be kept as a record subject to its inspection. The fact as to who was transferee was thus made material to this agency of the United States and a wilful misrepresentation was clearly within Section 80. The evidence showed that on four occasions McGurk cooperated with Pace who was buying tires as such dealer, in making and signing false invoices and receipts for them, and both were convicted. We think the evidence is not sufficient to justify the conclusion beyond a reasonable doubt that Hamner knew the false invoices were to be made or were made. He was a consumer of tires and not a tire dealer. He wished tires for his own car, his wife's car, his salesman's car and for eight trucks which he used in his business, and asked Pace, his friend, who for many years had

sold him tires and installed them, if they could be gotten. Pace reported he could get some from another dealer at Huntsville, some miles distant, but had no money to pay for them, and Hamner advanced $500 to be so used and furnished a truck and driver to haul them. Pace went to Huntsville, receipted a false invoice, and got a load of tires which were openly transported and unloaded at Hamner's place of business, and some of Hamner's cars and trucks were fitted out with part of them. All of Hamner's needs were not met, however, and Hamner furnished more money, and a second trip was made in like manner and Hamner's needs were thereby all filled and he had a settlement with Pace, paying him a balance. Hamner's entire bill and outlay was $1038, representing only tires put on his cars and trucks. Pace, in Hamner's absence and without his consent, again used the truck to haul tires, one of Hamner's employees permitting it because he knew Hamner had let Pace have the truck before. Hamner furnished no money for the tires then got, and had nothing to do with them, Pace selling them to others. Pace and McGurk as well as Hamner testify that Hamner had no interest in any transaction except to furnish the money and truck to get the tires he bought. No one testifies otherwise. No one says he had any knowledge of or participation in the false invoices. He testifies he knew nothing about them. He evidently did know that as a consumer he ought to have rationing certificates to buy new tires, and his banker had advised him not to fool with what we may call these bootleg or black market tires. He may possibly have been a partner in the business. But there is no direct evidence that he was, and the proven circumstances do not show that he participated in the making of these false certificates.

■ Two other substantive counts on which Hamner was convicted along with Pace and McGurk charged sales of new tires at prices in excess of the maximum prices fixed by regulation, four to Carter Wesley for $100 and four to Gustav Meyer for $150. The evidence shows that Pace sold these tires and collected the money for them, but the tires were among those taken to Hamner's place and there Pace installed them. Wesley testifies that a negro, who proved to be Pace's truckdriver, told him tires could be bought and took him to Pace's place of business, and that Pace there agreed to sell him four tires for $100 and collected the money, giving a receipt in his name for it. Pace told Wesley to follow Pace's truck, and the truck came to Hamner's place and Pace's driver, or a white man, got the four tires from a pile. Wesley testifies this was in the middle of the day and there was nothing secretive about it. Wesley did not see Hamner and does not know him. Meyer testified that he approached Pace to buy tires and was told Pace would have some the next day, March 13, for cash. Meyer returned at noon the next day, and Pace got in the car with him and they drove to Hamner's place. Hamner was an acquaintance of Meyer and showed him about the shop. Pace collected $150 for four tires and four tubes, and had his man install the tires while Pace, Meyer and Hamner got lunch together. Meyer says he had no conversation with Hamner about the tires, and had no thought Hamner was interested in the transaction, but that he heard Hamner tell Pace: "Get these tires away from here, I have all I need." No one says Hamner had any part or interest in the sale either to Wesley or Meyer. Pace and Hamner testify he did not. While again there may be a possibility Hamner was a partner, there is no proof beyond a reasonable doubt that he was.

■ If we are in error in holding that count two charges no crime, we should hold that the evidence does not show beyond a reasonable doubt that Hamner knew that Pace was by a trick concealing tires at Hamner's place. Again it is possible; but the circumstances are consistent with the theory of innocence that the tires were at first brought there with those intended for Hamner, and were left there for convenience till sold. Four tires were found on March 17, Hamner being absent, by police searching for stolen tires. Hamner, on hearing of it, had the tires taken back to Kelly-Springfield warehouse, whence he learned they had come. He says he was alarmed lest those which Pace and McGurk had sold him were stolen, and had them meet him at his hotel room to look into that. None of the tires turned out to be stolen. The police officer testified: "Mr. Hamner has helped us more than any of the other men * * *. He told me the truth about everything. He said all he was doing was letting Mr. Pace use his place to make transfers, that he was not realizing anything out of it." It

does not seem to us proven that Hamner was engaged in any trick or device to conceal tires from the Office of Price Administration. There is no direct testimony that he was, and the circumstances are explainable on a reasonable theory of innocence.

The judgment is reversed and the cause remanded for further proceedings not inconsistent with this opinion.

McCORD, Circuit Judge (dissenting).

I think the first count of the indictment charges a conspiracy, and that the second count, in plain and unambiguous terms, charges a fraudulent violation of rules and regulations and the making of false statements pertaining to matters within the jurisdiction of the Office of Price Administration, a government agency. 18 U.S.C.A. § 80. While the conspiracy count might have been more clearly and artistically drawn, I am of opinion that it meets the acid test when measured to decisions defining such offense. The majority opinion holds the first two counts to be bad, but I think they outride the shell-fire of the demurrers and should not be stricken. "It is enough to sustain an indictment that the offense be described with sufficient clearness to show a violation of law, and to enable the accused to know the nature and cause of the accusation and to plead the judgment, if one be rendered, in bar of further prosecution for the same offense." United States v. Behrman, 258 U.S. 280, 288, 42 S.Ct. 303, 66 L.Ed. 619; Wong Tai v. United States, 273 U.S. 77, 80, 81, 47 S.Ct. 300, 71 L.Ed. 545; United States v. Kenofskey, 243 U.S. 440, 37 S.Ct. 438, 61 L.Ed. 836; Cowl v. United States, 8 Cir., 35 F.2d 794; Bogy v. United States, 6 Cir., 96 F.2d 734; Beland v. United States, 5 Cir., 100 F.2d 289, 291; Hart v. United States, 5 Cir., 112 F.2d 128.

Moreover, I cannot agree with the majority opinion as to conclusions to be reached from a consideration of the evidence. Hamner furnished the money to Pace with which to purchase the automobile tires in question; he furnished a truck and a driver who drove from Houston to Huntsville, Texas. This driver was called in and given explicit instructions by Hamner as to where to go and the exact place where he was to meet Pace—not in a garage or warehouse, where automobile accessories are usually to be found, but on a certain corner of the court house square. In keeping with these instructions the driver met Pace at the court house square and the tires were loaded onto the truck just at night fall. These tires were billed out in the name of Robert Battaglia or his firm, Battaglia Brothers, of Lake Charles, Louisiana. It is without dispute that this billing was false, without the consent of Battaglia or his brother, who did not even know Hamner; that the tires were delivered to Hamner's place, of business in Houston in the night time and stored in a compartment of his warehouse; that Hamner paid out over one thousand dollars for tires all of which were delivered to him in his own trucks; and that he furnished money for Pace and McGurk to purchase tires. I cannot but believe from this evidence that he knew of every transaction which Pace and McGurk made. Even Lovel, Hamner's truck driver, asked Pace when the tires were loaded at Huntsville, "Is it all right, Mr. Pace?" Lovel explained what he meant in this way: "Well, I left the shop with the impression from Mr. Hamner that Mr. Pace would tell me what to do and where to go, you see, and I had been noticing in the paper about the freezing of these tires, and Mr. Pace being a tire dealer, I figured that he had a right and it would be all right for me to haul these tires for Mr. Pace and the reason I asked him where to go was whether his shop would be open or where he wanted them carried." Pace ordered Lovel to deliver the tires to Hamner's warehouse. Several thousand dollars worth of new tires were stored in Hamner's warehouse at Houston.

Hamner's banker warned him not to purchase tires "in as much as it would be a questionable matter". Notwithstanding this warning and advice Hamner secured the tires without first procuring a permit or certificate from the tire rationing board, and he paid out his money for tires which he knew or ought to have known were falsely billed to others. After Pace and McGurk had purchased and sold many hundreds of dollars worth of tires from Hamner's warehouse, he finally asked that the tires be removed from his place of business. Furthermore, when police made a search on his property for stolen tires, Hamner, Pace, and McGurk ran together like a covey of quail and were found in close conference in the room of a Houston hotel.

In my considered judgment, after a careful reading of the record, Hamner is not

598

the innocent outsider found in the majority opinion. It seems to me that he was an active participant and that, in the parlance of the street, he was in the "know" and was at every step consorting and confederating with Pace and McGurk. The learned trial judge, who tried the case without a jury, after seeing and hearing each witness testify, believed beyond a reasonable doubt that Hamner was guilty. I think his findings and judgment are supported by the evidence and should not be overturned, and that Pace and McGurk should not be required to bear punishment for the crime alone.

I think the judgment should be affirmed.

Rehearing denied; McCORD, C. J., dissenting.