## NYE & NISSEN et al. v. UNITED STATES.
### No. 11308.

Circuit Court of Appeals, Ninth Circuit.
June 21, 1948.

Rehearing Denied July 22, 1948.

Joseph B. Keenan, of Washington, D. C., and Harold C. Faulkner, A. J. Zirpoli, William M. Malone and Raymond L. Sullivan, all of San Francisco, Cal., for appellants.

Frank J. Hennessy, U. S. Atty., of San Francisco, Cal., and John S. Pratt, Lafayette E. Broome and John M. Kelley, Jr., Sp. Assts. to the Atty. Gen., for appellee.

Before DENMAN, HEALY and BONE, Circuit Judges.

DENMAN, Circuit Judge.

The Nye & Nissen corporation, Abraham Moncharsh, Henry Berman and Ruby Goddard were convicted after a trial before a jury upon all counts of an indictment charging them with conspiracy to defraud the United States, 18 U.S.C.A. § 88, and with filing six false claims with a government agency, 18 U.S.C.A. § 80. Moncharsh and the corporation alone have appealed.

Nye & Nissen was a California corporation which for many years carried on an extensive business in purchasing and selling eggs, butter and cheese. Moncharsh

was its president and was active in the conduct of its affairs. Henry Berman had been employed in various capacities by the corporation or its subsidiaries, and ultimately became manager of the City Sales Division of the corporation. Ruby Goddard was a shipping and receiving clerk, who made sales and deliveries on behalf of the corporation. A fifth codefendant, Edward Menges, who worked under Goddard, was acquitted.

During the period from 1938 through 1944, the Nye & Nissen corporation made numerous large sales of its products to the Army and the Navy. After December 1943, the corporation also sold large quantities of products to vessels which were operated by various shipping companies under general agency contracts with the War Shipping Administration. The charges upon which appellants here were convicted are based upon appellants' fraudulent conduct in connection with these transactions with the government.

I. 18 U.S.C.A. § 88 makes it an offense for two or more persons to conspire "to defraud the United States in any manner or for any purpose." Count I of the indictment charged that from about January 1, 1938, and continuing to June 20, 1945, defendants conspired to defraud the United States in several ways: by delivering, grading, selling, etc. inferior products to the War Shipping Administration, War Department and Navy Department through frauds and deceptions practiced upon them; by obstructing the inspection of such products by the government; and by avoiding the standards to which purchases of products were subject through false grading and weighing. This is followed by an allegation that it was "a part of the plan" that defendants would place false inspection stamps on cases of eggs; would misrepresent the grade, weight and price of eggs, butter and cheese; and that they would employ other tricks and schemes which are described in detail. The indictment concludes with an allegation of several overt acts.

Appellants complain at the outset that this count is insufficient because it fails to allege clearly and distinctly what agreement the defendants were supposed to have made; and secondly, because it is duplicitous in alleging more than one conspiracy.

It was held in Hamner v. United States, 5 Cir., 134 F.2d 592, relied upon by appellants in this connection, that an allegation that defendants conspired to defraud the United States, followed by allegations of what the defendants did in fact do, does not meet the requirement that the agreement be clearly and distinctly alleged. No such inferential method of pleading was adopted in the present case. The allegation that defendants conspired to defraud the United States is followed, not by allegations of what the defendants *did*, but rather by a detailed statement of the things which they *planned* to do.

Even so, appellants complain that it was not sufficient to allege that defendants conspired to defraud the United States "by impeding, impairing, obstructing, and defeating the lawful functions of the United States Department of Agriculture, War Department, and Navy Department in the inspection, grading, weighing, and purchase of butter, cheese and eggs." This, according to appellants, is a mere statement of legal conclusions and fails to describe any agreement with the required certainty.

This general allegation does not stand alone. It is followed by a detailed description of the means by which the conspirators planned to impede, etc., the government's inspection functions. Taken in context, it is sufficiently definite to inform the defendants of the charges against them. It shows "certainty to a common intent" and greater particularity is not required. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 462, 86 L.Ed. 68. In the Glasser case it was held sufficient to allege that defendants conspired to " 'defraud the United States of and concerning its governmental function to be honestly and faithfully and dutifully represented in the courts of the United States' * * * 'free from corruption, improper influence, dishonesty or fraud,' " such statements being followed by an allegation respecting the means to be used in accomplishing the conspiracy. The allegations in the present case are no less definite.

850

Appellants' contention that Count I is duplicitous is based on the fact that the War Shipping Administration did not come into existence until 1942, four years after the date of the alleged commencement of the continuing conspiracy. Appellants reason that since no conspiracy formed in 1938 could have contemplated defrauding the War Shipping Administration, the indictment in effect alleges two separate and distinct conspiracies: one in respect to the departments and agencies other than the War Shipping Administration and a subsequent one in respect to the War Shipping Administration alone.

■ It would seem questionable whether we would be justified in saying, on the basis of the indictment alone, that defendants in 1938 could not have contemplated the future creation of governmental agencies to engage in the purchase of eggs. However that may be, the conspiracy charged here is a "continuing" one, the constant objective of which was to deceive agencies of the United States as to the grade or quality of the products handled by Nye & Nissen for sale to the United States. "[W]here a common thread runs through all of the actions and a common purpose animates all of the conspirators, the fact that many persons come into, and many acts are embraced in, the conspiracy does not make the charge duplicitous by charging many instead of one conspiracy." United States v. New York Great A. & P. Tea Co., 5 Cir., 137 F.2d 459, 463. See also, United States v. Austin-Bagley Corp., D.C., 24 F.2d 527. The situation here resembles that in Rose v. United States, 9 Cir., 149 F.2d 755, where the indictment charged a continuing conspiracy to violate several statutes, one of which had not been passed at the date the conspiracy was formed. Paraphrasing what we said there: The conspiracy was unlawful as to the War and Navy Departments, and continued to be unlawful as to the War Shipping Administration.

■■ The mere fact that it was grammatically possible to have alleged a separate conspiracy against the War Shipping Administration in a separate count is not in itself material, although appellants appear to suggest otherwise. A single conspiracy may embrace several related conspiracies. And the rule is settled that a single conspiracy may have as its object two or more wrongful acts, and that an indictment charging such a conspiracy is not duplicitous for that reason. Braverman v. United States, 317 U.S. 49, 63 S.Ct. 99, 87 L.Ed. 23.

The remaining six counts of the indictment each charges, under 18 U.S.C.A. § 80, that defendants, on a particular occasion, caused "to be made and used * * * a false invoice for the sale and delivery" of products "to the United States of America, War Shipping Administration." Count II, for example, after reciting that Agwilines, Inc. entered into a general agency contract with the United States through the War Shipping Administration, alleges that defendants presented an invoice "to the United States of America, War Shipping Administration, Agwilines, Interocean S. S. Co., General Agents," for products delivered to the S. S. Cape Charles, a vessel maintained and supplied by Agwilines "for the account of the United States."

Appellants, relying on Lowe v. United States, 5 Cir., 141 F.2d 1005, urge that the allegations of these counts do not show that the false claims were made "in any matter within the jurisdiction of any department or agency of the United States" within the meaning of 18 U.S.C.A. § 80. The defendant in the Lowe case presented a false claim to the payroll department of his employer, a private company. The company's contract with the government provided that the company should be reimbursed from the United States Treasury for such payments, but did not place the payroll department under the supervision of any federal agency. "Insofar as the employee was concerned, every aspect of his employment was exactly the same as it would have been had there been no contract with any governmental agency of any kind."

■ The contracts in the present case go much further than to provide merely that the private shipping companies should be reimbursed by the government for the products they purchased from defendants. Here, defendants' products were purchased

by the private companies as contract agents for the United States, War Shipping Administration. Such purchases were made subject to the orders, regulations and supervision of the United States, were frequently paid for from moneys advanced by the United States, and were in effect purchases by the United States: a fact which would be recognized by defendants in addressing their invoices "to the United States of America, War Shipping Administration." We believe, therefore, that the purchases alleged were matters within the jurisdiction of the War Shipping Administration and that the false invoices were presented in those matters.

Finally, appellants urge that the indictment was so vague that it was an abuse of discretion for the trial court to deny their motion for a bill of particulars. This motion specified 106 matters in which defendants desired further information.

■ To the extent that the motion called for such information as what governmental functions defendants conspired to impede, or what means defendants planned to use in impeding them, we believe the answers are adequately supplied by the indictment itself. The information requested, however, appears to concern only the details of the evidence which was to be relied upon by the government in support of its charges: the times, places and persons involved in various evidentiary transactions, etc.

■ It is elementary, of course, that the denial of a bill of particulars is not ground for reversal if it does not amount to an "abuse of discretion." Wong Tai v. United States, 273 U.S. 77, 47 S.Ct. 300, 71 L.Ed. 545. We agree with appellee that the indictment here is an exceedingly specific document, and that no abuse of discretion is shown to have resulted from the trial court's refusal to compel disclosure of further particulars. Although it may be true that defendants could not have known in advance of trial what various facts and circumstances were to be relied upon by the government as proof of the alleged conspiracy, this does not necessarily indicate that they were prejudiced by the denial of their motion. The government should not be compelled by a bill of particulars to make a "complete discovery" of its entire case. Braatelien v. United States, 8 Cir., 147 F.2d 888; Rubio v. United States, 9 Cir., 22 F.2d 766, certiorari denied 276 U.S. 619, 48 S.Ct. 213, 72 L.Ed. 734.

■ II. Appellants contend that there was no substantial evidence to support a verdict of guilty as to either of them upon any of the seven counts of the indictment. The trial below consumed several months, during the course of which thousands of pages of testimony were taken, much of it highly conflicting. We must regard this evidence and the inferences to be drawn therefrom in the aspect most favorable to the appellee. Phelps v. United States, 8 Cir., 160 F.2d 858; Miller v. United States, 8 Cir., 138 F.2d 258; Gorin v. United States, 9 Cir., 111 F.2d 712, 721, affirmed 312 U.S. 19, 61 S.Ct. 429, 85 L.Ed. 488; Curley v. United States, 81 U.S.App.D.C. 389, 160 F.2d 229, certiorari denied 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850.

Witnesses for the government, some of whom had been in the employ of Nye & Nissen for many years, testified to numerous incidents such as the following: Once during 1941, upon instructions of Moncharsh, Goddard and Menges, candlers were instructed to prepare an order by placing Grade A eggs in some cases and eggs of an inferior type in other cases. The cases of inferior eggs were given an identifying mark. When an Army inspector called to examine the order, it was arranged that he should inspect none but the cases containing the Grade A eggs. Being so deceived, the inspector approved the whole order. On another occasion in 1941, Goddard and one of the witnesses purported to "assist" an Army inspector by placing an inspection stamp upon cases from lots other than the lot which the inspector had sampled and approved. Labels were also stamped under Goddard's instructions, these labels later being placed upon uninspected cases of eggs. On another occasion in 1941, after an Army inspector had selected certain cases for examination and was in the candling room, the remaining cases in the lot was removed and other eggs substituted for them, again with the result that the inspector was deceived into approving

eggs other than those which he had sampled. On an occasion in 1942, under directions of Moncharsh, Goddard, Berman and Menges, eggs were removed from cases bearing government stamps, inferior eggs being substituted therefor. In 1939, a delivery of eggs was made to the Navy, all cases bearing a stamp which falsely purported to be the inspection stamp of the Department of Agriculture. On another occasion in 1939, a delivery of eggs to the Army was rejected. Under instructions of Goddard, the same eggs were later redelivered at a time when it was likely that the inspector would be in a hurry, and would therefore approve the load. At another time, 150 cases of eggs were delivered to the Navy, some of them being of inferior quality to the others. Under directions of Goddard, the better cases were placed on top of the stacks as they were unloaded, it being thought unlikely that the top cases would be selected as samples for inspection. On one occasion in 1942, Nye & Nissen employees cut prints of butter weighing 15 ounces, falsely indicating to the Army inspector, who was present at the time, that such prints weighed 16 ounces. On another occasion in 1942, under the directions of Goddard and Moncharsh, inspection stamps were buffed off cases of eggs, these cases being later resubmitted to government inspectors under the pretense that they were from a different lot than that previously inspected.

The proof for the years 1943 and 1944 concerns chiefly the delivery of eggs and cheese to 17 different ships operated by the War Shipping Administration. These deliveries were generally made under the supervision of Berman or Goddard. Sales to the War Shipping Administration during 1944 required inspection prior to delivery, and this was done by the United States Department of Agriculture. One of the 17 deliveries occurred in 1943, the rest in 1944. Six of them are the ones involved in the false claims counts. In none of them did the products delivered entirely conform with the grade, weight or quality stated in the invoices covering them. In one instance, 6 cases of eggs invoiced Grade AA were so poor as to be entitled to no grade whatever. In another, "several layers" of 3 dozen eggs each were missing from some of the cases. In another, the weights were scraped off boxes containing cheese, the invoice indicating that the cheese was of greater than actual weight. In another, cases of eggs bearing inspection stamps and invoiced as medium AA were found to be Grade B small. In another, 10 cases of peewees were intermingled with cases of mediums, the whole being invoiced as mediums. Many of the cases delivered bore no inspection stamps.

No useful purpose can be served by accumulating such examples here. Suffice it to say that there are many similar ones to be found in the record.

■ The existence of a conspiracy may be inferred from acts of persons which are done in pursuance of an apparent criminal purpose. Blumenthal v. United States 9 Cir., 158 F.2d 883, affirmed 332 U.S. 539, 68 S.Ct. 248. We think such an inference is permissible here. The evidence justifies, if it does not compel the conclusion that Nye & Nissen Corporation, its officers and employees, conspired to defraud the United States in its functions relating to the purchase of eggs, butter and cheese.

Appellants contend, however, that the evidence is insufficient to connect Moncharsh specifically with any such conspiracy; that such a connection is not established by proof that he was the president of and a stockholder in Nye & Nissen.

■ Once the existence of a conspiracy is clearly established, slight evidence may be sufficient to connect a defendant with it. Meyers v. United States, 6 Cir., 94 F.2d 433, certiorari denied 304 U.S. 583, 58 S.Ct. 1059, 82 L.Ed. 1545; Phelps v. United States, 8 Cir., 160 F.2d 858. The evidence here is more than slight.

Moncharsh exercised supervision over activities at the corporation's plant and was frequently present there; occasionally he supervised the unloading of a shipment of eggs which was received. A rubber stamp similar to a Department of Agriculture inspection stamp was once in his possession. He once ordered an employee to buff inspection stamps off cases of eggs which had been inspected. He told an employee how to redeliver a truck load of rejected eggs

so as to deceive the inspector. He once started to stamp uninspected cases to substitute for inspected ones when an inspector returned suddenly, and Moncharsh hurriedly put the stamp in his pocket. He occasionally called an inspector to the plant and designated the eggs to be inspected. He once directed a man as to how to put up some cases which were to be inspected. He gave directions with respect to storage eggs which were substituted for fresh eggs which had been inspected. He twice participated in transferring eggs from stamped cases and replacing them with inferior eggs. He once told the Federal Bureau of Investigation that he set the policy of the Nye & Nissen plant, decided prices, and knew the quality of eggs shipped. When another officer of the corporation told Moncharsh, "If you don't cut this kind of business out you are going to get all of us in the penitentiary," he replied: "What is the matter with you guys? Are you afraid"?

■ This evidence is sufficient to sustain a finding that Moncharsh knowingly participated in the conspiracy.

Appellants contend that the evidence cannot support a finding that the conspiracy was a "continuing" one as charged, and that a variance exists in this respect. This argument is based upon the fact that the proof for the years prior to 1943 related primarily to impeding the government's inspection system, while the proof after that time related chiefly to deficient deliveries of products to the War Shipping Administration. From this, appellants conclude that if a conspiracy existed in 1944 it was a new and separate conspiracy rather than a continuation of the one existing prior to 1943. Since the acts connecting Moncharsh with the conspiracy occurred mainly in the period before 1943, it is doubtful whether such a variance, if it exists, could be treated as immaterial under Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314.

We do not believe that the evidence compels such a narrow conclusion as that for which appellants contend. Although the character of the acts shown by the proof may have been somewhat different after 1943, it is scarcely conceivable that any of the acts were done with any purpose in view other than that of deceiving the government as to the inferior quality of eggs being sold to its agencies by Nye & Nissen. Such an inference flows quite as naturally from the evidence concerning defendants' circumvention of the inspection system as it does from the evidence concerning the false invoices covering the deliveries to the War Shipping Administration. All misconduct of defendants was germane to one consistent and persistent course of wrongdoing. "[W]hen the plot contemplates bringing to pass a continuous result that will not continue without the continuous co-operation of the conspirators to keep it up, and there is such continuous co-operation, it is a perversion of natural thought and of natural language to call such continuous co-operation a cinematographic series of distinct conspiracies, rather than to call it a single one." United States v. Kissel, 218 U.S. 601, 607, 31 S.Ct. 124, 126, 54 L.Ed. 1168.

■ Since the evidence justifies a finding that the substantive offenses which are the subjects of Counts II through VII were committed in furtherance of a continuing conspiracy of which Moncharsh was a member, it should follow that the evidence is also sufficient to support a finding of Moncharsh's guilt on those counts under the rule in Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489. Appellant Moncharsh does not contend that he had withdrawn from the conspiracy before the substantive offenses were committed, but seeks to avoid the force of the Pinkerton case on other grounds.

■ First, appellant points out that the conspiracy count in the Pinkerton case charged a plot to violate certain statutes, the actual violation of which became the subject of the substantive counts. This is not the case here, where Count I charges a conspiracy to defraud but does not allege a plot to violate 18 U.S.C.A. § 80 or any other statute. The conclusive answer to this contention is that the liability of a co-conspirator for crimes in furtherance of the conspiracy in no way depends upon the scope or existence of a conspiracy count. "Although conspiracy be not charged, if it

be shown by the evidence to exist, the act of one or more defendants in furtherance of the common plan is in law the act of all." Davis v. United States, 5 Cir., 12 F.2d 253, 257; Pinkerton v. United States, 5 Cir., 151 F.2d 499, 500.

Second, appellant points out that in the Pinkerton case the jury was instructed that they "would have a right" to convict each defendant on the substantive counts provided the acts referred to in them were in furtherance of the conspiracy. No such instruction was given in the present case. Here the case was submitted to the jury with an instruction under 18 U.S.C.A. § 550 that "one who aids, abets, counsels, commands, induces, or procures the commission of an act is as responsible for that act as if he committed it directly." It is the gist of appellant's contention in this respect that unless there is substantial evidence to support the verdict under the instructions which were given, the verdict cannot be sustained on the ground that the evidence was sufficient under a theory as to which the jury was uninstructed.

No authority is cited in support of the point so raised and our search fails to reveal any federal case in which it has been expressly considered. Cf. Cochran v. United States, 8 Cir., 41 F.2d 193, 205; Pelz v. United States, 2 Cir., 54 F.2d 1001, 1003. It is true that the jury must follow the rules of law given by the trial judge. Carroll v. United States, 2 Cir., 16 F.2d 951, certiorari denied 273 U.S. 763, 47 S.Ct. 477, 71 L.Ed. 880. The force in appellant's contention arises from the implication that if the evidence is not sufficient under the instructions given, the jury must have disregarded those instructions in reaching its verdict.

Even so, there is some authority to the effect that a verdict supported by evidence will stand although it was rendered in disregard of an erroneous instruction. See 23 C.J.S., Criminal Law, § 1393, p. 1074. "[I]t would seem to be but common sense that, where a defendant was fairly tried and the jury had found that he had done a

certain act which was an offense against the law, that he should not escape punishment because of an erroneous statement of the law which the jury had not followed." Stephens, J., in People v. Abbott, 132 Cal. App. 109, 22 P.2d 566, 567. If this reasoning is sound, it would seem that it should also apply where, as here, the instructions given were correct as far as they went. Cf. State v. Reed, 39 N.M. 44, 39 P.2d 1005, 102 A.L.R. 995.

■ Whatever the answer to this problem may be, we are of the opinion that the verdict of the jury on the substantive counts did not disregard or go beyond the scope of the instructions given. Appellants' contention to the contrary is answered by the Pinkerton case itself.

■ So long as the conspiracy existed, the members acted for each other in carrying it forward. The criminal intent to commit substantive offenses in furtherance of the unlawful project was established by the formation of the conspiracy. "Each conspirator *instigated* the commission of the crime. The unlawful agreement contemplated precisely what was done. It was formed for the purpose. The act done was in execution of the enterprise. *The rule which holds responsible one who counsels, procures, or commands another to commit a crime is founded on the same principle.*" (Emphasis supplied.) Pinkerton v. United States, 328 U.S. 647, 66 S.Ct. 1184, 90 L.Ed. 1489.[1]

■ To "instigate" means to aid, promote, or encourage the commission of an offense. One of its synonyms is "abet." Vol. 21, Words and Phrases, Perm.Ed. page 662. Evidence that a defendant was associated with others in a conspiracy was held sufficient to sustain a finding that defendant aided or abetted the acts committed in furtherance of the conspiracy by this court in Johnson v. United States 9 Cir., 62 F.2d 32, 34, a case relied upon by the Supreme Court in Pinkerton v. United States. The same result should be reached here.

---

1 Cf. the statement in (1947) 56 Yale L.J. 371, 376: "The ruling in the [Pinkerton] case either incorporates the aiding and abetting clause within the conspiracy section or creates a conclusive presumption that each conspirator aids and abets every act within the scope of the conspiracy."

■ Appellant points out that he was not charged as an aider and abettor, but this is not necessary in order to hold him as such. Melling v. United States, 7 Cir., 25 F.2d 92; O'Brien v. United States, 7 Cir., 25 F.2d 90; United States v. Decker, D. C., 51 F.Supp. 20.

III. The remaining points raised by appellants on this appeal relate to rulings upon evidence, the giving and refusal of instructions, and similar matters.

■ Testimony concerning the condition of eggs on certain days was admitted as evidence of their condition on previous days. The admission and refusal to strike this testimony is complained of as error on the ground that since eggs are highly perishable, no inference as to their condition at a prior time may be based upon evidence of their condition at a subsequent time. We are not persuaded, however, that the quality of an egg which is handled in the manner in which such commodities are ordinarily handled is as unstable as a soap-bubble or as fugitive as the frost on a window pane. "Where the condition is of such character that a brief lapse of time would not affect it materially, the subsequent existence of the condition may give rise to an inference that it previously existed. * * * Any intrinsic weakness in such evidence goes to its weight rather than its admissibility * * *." F. W. Woolworth Co. v. Seckinger, 5 Cir., 125 F. 2d 97, 98. Appellants could and did introduce evidence tending to diminish the strength of such inferences. Under the circumstances presented here, we cannot hold that this explanatory evidence was of such force that no inference whatsoever might be drawn by the jury in appellee's favor.

During cross-examination of appellant Moncharsh on whether he had received complaints in regard to eggs supplied under government contracts, he was asked if he had had difficulties with the Navy in that respect. The answer being in the negative counsel asked: "Weren't you debarred for a period of ten years—" An objection was interposed immediately; the reference to debarment was ordered stricken and the jury was instructed to disregard it.

During direct examination, one of the government's witnesses testified that he had taken 3 eggs from cases delivered by defendants to Francis W. Parker. These eggs were very small, and when shown to the witness for identification they were contained in a Nye & Nissen carton which bore the inscription "Large Grade A." After identifying the eggs, the witness stated that he had never seen the carton before, whereupon the eggs were offered in evidence without the carton. At this point, upon request of appellants, the jury was clearly and fully instructed to disregard everything having to do with the carton, which was promptly removed. Some discussion by counsel followed from which it appears that the jury might not have known of the inscription on the carton except for the fact that it was pointed out by counsel for appellants.

■■ Both of these incidents are complained of as misconduct of the prosecution. It is significant that in this lengthy trial, covering many weeks during which abundant evidence of guilt was introduced, these are the only incidents of alleged misconduct called to our attention to which objection was made below. They appear to have been "casual episodes," not representative of the trial as a whole. We cannot say that their prejudicial effect, if any, was not successfully eradicated by the instructions of the trial judge to disregard them. Utley v. United States, 9 Cir., 115 F.2d 117; Landay v. United States, 6 Cir., 108 F.2d 698; Bogy v. United States, 6 Cir., 96 F.2d 734. Jurors may be credited with "sufficient common sense and discrimination to enable them to evaluate conduct and remarks of counsel even if the conduct and remarks should offend ordinary standards of propriety." United States v. Goodman, 7 Cir., 110 F.2d 390, 395.

■ Several letters addressed to appellant Moncharsh or shown to have come to his attention were introduced in evidence for impeachment purposes after Moncharsh, both on direct and cross-examination denied that he knew of any complaints concerning the delivery of eggs other than one from William S. Clark. These letters concerned a complaint in regard to rotten eggs delivered

to the S. S. Bates. Appellant urges that the letters were hearsay and were inadmissible for impeachment since they concerned a collateral matter, citing Attorney General v. Hitchcock, 1 Ex. 91 and Ewing v. United States, 77 U.S.App. D.C., 14, 135 F.2d 633. The letters here, however, do not relate to a collateral matter within the rule of those cases. An intent to defraud was an element of the crime of conspiracy, for which Moncharsh was indicted. Bergen v. United States, 8 Cir., 145 F.2d 181. The letters tended to prove that Moncharsh knew of the practices engaged in by Nye & Nissen's employees, and therefore were relevant to the question of fraudulent intent. Rice v. United States, 10 Cir., 149 F.2d 601, 603, and cases cited. It follows that they were properly admitted to contradict the statements made by Moncharsh as a witness.

 A letter written by the manager of the Los Angeles office of Nye & Nissen, addressed to Moncharsh, and complaining of the eggs and butter delivered to the William S. Clark, was also introduced over an objection that it was hearsay as to the remaining defendants. Appellants now contend that no proper foundation had been laid for introducing the letter by proof that it was mailed. Not only was no objection made on this ground, but it is doubtful that it could have been sustained if made in view of a preliminary statement of the manager that the letter was either sent separately in the mail or was put in with other papers in a daily report. Furthermore, the manager subsequently testified that Moncharsh critized him for writing the letter. The foundation for admitting the letter having been supplied in this way by other evidence, any possible error in a previous oversight was harmless. Hartzell v. United States, 8 Cir., 72 F.2d 569, 578.

The entire testimony of Pineda, one of the principal witnesses for the government, was received over the objection of appellants and subject to a motion to strike. This testimony, covering 622 pages in the printed record, contains, inter alia, an extended account of numerous instances in which Pineda observed deceptions being practiced upon government inspectors. A written motion to strike all this testimony in respect to 24 separate subjects (e. g. "1. All testimony relating to any fact, act or occurrence in which eggs were involved") was denied. Appellants now complain that this was error, since the entire testimony was "so permeated with prejudicial hearsay statements, irrelevant and immaterial testimony entirely unrelated and unconnected with the issues in the case, that it should not have been allowed to stand."

 Preliminarily, it may be remarked that appellants' brief does not contain any specifications of error as required by Rule 20(d), nor any other statement referring to the places in the record where the hearsay statements or irrelevant material which appellants assert "so permeate" Pineda's testimony may be found; nor is there any designation of the portions of the record which relate to the 24 subjects listed in the motion. Failure to comply with the rule requiring specifications of error has been held sufficient to warrant this court's refusal to consider contentions in regard to the admission of evidence. Roedel v. United States, 9 Cir., 145 F.2d 819; Tudor v. United States, 9 Cir., 142 F.2d 206; Conway v. United States, 9 Cir., 142 F.2d 202; Utley v. United States, 9 Cir., 115 F.2d 117; Waggoner v. United States, 9 Cir., 113 F.2d 867. We have, nevertheless, examined Pineda's testimony and are of the opinion that much of it was obviously competent, relevant and material. Part of it being admissible, a motion to strike it all was properly denied. Marx v. United States, 8 Cir., 86 F.2d 245; Hogg v. United States, 5 Cir., 53 F.2d 967, certiorari denied 285 U.S. 556, 52 S.Ct. 457, 76 L.Ed. 945; West v. United States, 8 Cir., 15 F.2d 916; Zottarelli v. United States, 6 Cir., 20 F.2d 795. This is true although it appears unequivocally that the witness was mistaken in respect to a particular matter, e. g. the year in which something occurred, Sanchez v. United States, 1 Cir., 134 F.2d 279; or that his testimony on some matters was uncertain or vague, United States v. Greenstein, 2 Cir., 153 F.2d 550.

 An egg candler employed by Nye & Nissen was allowed to testify that she was once directed to candle U.S. Special eggs; that she saw the cases so graded being inspected by an Army inspector later

on the same day; that the inspector stamped each of the cases when he finished examining them; that the witness was then instructed to remove the eggs from the inspected and stamped cases, and to replace them with eggs which she observed to be much inferior; that after the inferior eggs were substituted, she heard the lids being nailed on the cases. Appellants complain that this evidence was immaterial, and that it was never connected with any transaction in the indictment.

We are unable to agree with this contention. Not only did this evidence corroborate the testimony of other witnesses relating to the deceptive practices indulged in by defendants, but it was also relevant under Count I which charged that it was part of the conspiracy to defraud that: "Defendants * * * would remove eggs from cases which had been officially inspected, graded, and stamped, and replace them with eggs of an inferior grade". Whether or not the evidence is per se proof of fraud, it certainly tends to establish an agreement to defraud. In a conspiracy case, wide latitude is allowed in presenting evidence, and it is within the discretion of the trial court to admit evidence which even remotely tends to establish the conspiracy charged. Phelps v. United States, 8 Cir., 160 F.2d 858; Egan v. United States, 8 Cir., 137 F.2d 369, certiorari denied 320 U.S. 788, 64 S.Ct. 195, 88 L.Ed. 474.

 Appellants urge that the trial court erred in refusing to give several instructions requested by them. We find that the substance of the offered instructions on burden of proof, reasonable doubt, circumstantial evidence, presumption of innocence and the definition of "false invoice" was adequately presented in the charge as given. Instruction No. 119 was to caution the jury that no inference should be indulged against any defendant because of objections made by his counsel to the introduction of evidence. Johnson v. United States, 8 Cir., 126 F.2d 242, cited by appellants as supporting this instruction, merely holds that it was not error to refuse to instruct that no additional weight was to be attached to a closing argument by reason of the fact that it was delivered by a government official, when an instruction was given cautioning the jury that they should not be influenced by actions or expressions of counsel. The court in the present case fully instructed the jury that they should confine themselves to considering only the evidence introduced; that such inferences as they might draw must be based upon that evidence alone, not upon speculation as to evidence which might have been introduced; and that statements of counsel in argument or presentation are not evidence. Refusal to add appellants' proposed cautionary instruction under these circumstances, if error, was not prejudicial.

 Proposed instruction No. 121, also refused, contained a statement that a completed act which is not an offense at the time it is committed cannot become such by any subsequent act of the party charged or of another with which it has no connection. This also could not have been prejudicial in view of the court's detailed instructions defining each of the necessary elements constituting the offenses with which defendants were charged.

During the trial, evidence was admitted which tended to show the commission of numerous prior offenses similar to those charged in the substantive counts of the indictment. As we have already indicated, this evidence was admissible against Moncharsh under Count I to show the continuance of the conspiracy of which he was a member. Appellants contend, however, that the trial court erred in allowing the jury to consider this evidence under the substantive counts for the purpose of determining the intent with which each defendant committed the acts charged in those counts.

 Proof of the substantive counts required, as the trial court instructed, proof of a specific intent to defraud the United States. It is settled law that similar offenses may be admissible to show such intent. Tedesco v. United States, 9 Cir., 118 F.2d 737. Specifically, the argument made here is that the prior similar offenses cannot be considered as evidence of Moncharsh's guilt under the substantive counts, since Moncharsh was not shown to have had any connection with them. This con-

858

tention ignores the evidence indicating that Moncharsh participated in a conspiracy, in furtherance of which the acts charged in the substantive counts and the prior offenses were committed. This evidence establishes Moncharsh as an instigator of such acts and offenses, which thereby became admissible against him in determining his guilt under the substantive counts. Pinkerton v. United States, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489.

The judgment appealed from is affirmed.